PENSION BENEFIT GUARANTY CORPORATION, Plaintiff,

v.

Jared H. DICKENS, et al., Defendants.

No. G 80–421.

United States District Court, W. D. Michigan.

Feb. 23, 1982.

Henry Rose, Washington D. C., James S. Brady, U. S. Atty., Grand Rapids, Mich., for plaintiff.

Jon R. Muth, Grand Rapids, Mich., Donald E. Egan, Howard J. Stein, Chicago, Ill., Gary L. Nicholson, Grand Rapids, Mich., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MILES, Chief Judge.

In this case the plaintiff PBGC seeks to be appointed permanent trustee of the Challenge Stamping and Porcelain Company Hourly Employees Pension Plan, to have the Pension Plan ordered terminated, to establish a termination date of August 10, 1979, and to have defendant Heinicke Instruments Company adjudged to be a member of the control group of Puffer-Hubbard Products, Inc. for the purpose of employer

liability under section 4062 of Title IV of ERISA, 29 U.S.C. § 1362. None of the defendants contest termination of the Pension Plan or the appointment of PBGC as trustee of the Plan. The only contested issues are the date of termination and whether Heinicke Instruments is a member of the control group of Puffer-Hubbard.

Jurisdiction over this action is proper under 29 U.S.C. §§ 1303 and 1342. Heinicke Instruments made a general appearance in this court to contest the merits of the suit.

Following a bench trial on January 11, 1982, and the stipulation of the parties as to certain uncontested facts, the court renders the following Findings of Fact and Conclusions of Law.

### Findings of Fact

The PBGC is a wholly-owned government corporation, established under Section 4002 of ERISA, 29 U.S.C. § 1302, to administer the pension plan termination insurance program established by Title IV of ERISA.

Puffer-Hubbard Products, Inc., formerly named Challenge Stamping and Porcelain Company, Inc., is a Michigan corporation with principal offices in the state of Michigan. CSP Company, Inc. is a holding company incorporated in Delaware with principal offices in Illinois. At all times relevant to this action CSP owned 100% of the stock of Puffer-Hubbard. This was the only asset of CSP. Puffer-Hubbard's manufacturing operation was located in Grand Haven, Michigan.

Heinicke Instruments Company is a corporation organized under the laws of the state of Florida with principal offices in Florida.

The Challenge Stamping and Porcelain Company Hourly Employees Pension Plan was established on August 25, 1959 and continued to be maintained by Puffer-Hubbard for the benefit of its employees. This Plan was at all relevant times qualified under applicable provisions of the Internal Revenue Code, and was subject to the provisions of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., including Title IV, Section 4001 et seq. of the Act, the Plan Termination Insurance Program. The benefits provided by the Plan are non-forfeitable benefits insured by the PBGC pursuant to Section 4022(a) of ERISA, 29 U.S.C. § 1322(a). The Pension Plan was substantially underfunded at all times relevant to this action.

On or about March 11, 1979, Jared Dickens, a former employee of Puffer-Hubbard, purchased 100% of the stock of CSP for $1.00. At that time most of Puffer-Hubbard's production workers had already been laid off. Dickens immediately laid off all workers and filed Chapter XI bankruptcy proceedings for Puffer-Hubbard on March 26, 1979. The next day Dickens restarted production with capital obtained by selling the building owned by Puffer-Hubbard, and leasing it back. The workers continued to be employed under the existing union contract including the Pension Plan.

Dickens was contacted by Heinicke Instruments shortly after he purchased CSP and Puffer-Hubbard. Heinicke manufactured products complementary to those of Puffer-Hubbard and was interested in acquiring Puffer-Hubbard in order to broaden Heinicke's product line. Dickens understood Heinicke's interest to be in continuing Puffer-Hubbard's operation in Grand Haven. Although Heinicke's interest continued over the next few months, no sale was consummated because Puffer-Hubbard could not provide accurate data concerning its financial condition. Heinicke was aware that Puffer-Hubbard had filed bankruptcy proceedings.

Dickens first contacted PBGC in April, 1979 in order to solicit PBGC's help in salvaging the company and, thus, the Pension Plan. There is no record of any action taken by PBGC at that time.

Puffer-Hubbard was operated as a Debtor-in-Possession under the jurisdiction of the Bankruptcy Court from March 26, 1979 until April 26, 1979. On April 26 the Bankruptcy Court appointed a receiver, Maurice Edleman, who took over operations of the company. Edleman continued manufacturing, employing Dickens to act as the on-site

manager of the company. The receiver operated the company according to the "Amended Definitive Order" of the Bankruptcy Court, dated April 26, which required regular accounting to the Court of actions taken by the receiver.

Puffer-Hubbard continued to negotiate with prospective purchasers of the company or of its assets. On June 24, 1979 Rheem Manufacturing Co. tendered an offer to purchase the assets of Puffer-Hubbard for $710,000. Dickens accepted this offer on behalf of Puffer-Hubbard, subject to approval of the Bankruptcy Court. On July 26 Puffer-Hubbard petitioned the Bankruptcy Court for approval of the sale of assets to Rheem.

When Heinicke learned of the proposed sale of assets it realized that its plan of reorganizing and continuing Puffer-Hubbard operations would have to be presented to the Bankruptcy Court in order to forestall the proposed sale. In furtherance of this purpose Heinicke purchased all of the stock of CSP (which owned all of the stock of Puffer-Hubbard) on July 30, 1979, from Dickens, for the sum of $1.00. At the same time it entered into an agreement to employ Dickens as a manager for the "rehabilitation and reorganization of Puffer-Hubbard Products, Inc." Both Heinicke and Dickens recognized that the CSP stock would be worthless, and the employment contract would be void, unless the Bankruptcy Court disapproved the sale of assets to Rheem and allowed Heinicke to take over and operate Puffer-Hubbard.

The Bankruptcy Court held a hearing on August 6, 1979 at which it approved the sale to Rheem over the objections of Heinicke, Dickens, and the State of Michigan. The order approving the sale was issued on August 9, 1979 and Puffer-Hubbard ceased all operations on August 10, 1979. No employees worked, no pension benefits occurred, and no contributions to the plan were made for any period after August 10.

Subsequent to the cessation of Puffer-Hubbard operations Dickens was advised by his attorney that he should seek return of the CSP stock for unrelated legal reasons.

On August 27, 1979 Heinicke returned the stock to Dickens and cancelled the employment agreement purportedly because the conditions of the sale and agreement had not been met due to the sale to Rheem. Dickens approved the cancellation of his employment contract.

On November 1, 1979 the Bankruptcy Court authorized termination of the Pension Plan. Notice of intent to terminate the Plan was filed with the PBGC on December 17, 1979 asking that the termination date be established as December 15, 1979. On June 24, 1980 the PBGC issued its Notice of Determination notifying the Board of Administration of the Pension Plan that the assets of the Plan were insufficient to discharge all of the obligations of the Plan. The PBGC further notified the Board that it intended to institute termination proceedings in accordance with section 4042 of ERISA, 29 U.S.C. § 1342. The PBGC filed this action on June 25, 1980.

### Conclusions of Law

#### Termination Date

■ The Supreme Court has discussed certain aspects of the Plan Termination Insurance Program created by Title IV of ERISA in *Nachman Corp. v. PBGC*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). Although *Nachman* is not directly applicable to the issues contested here; it affirms that the purpose of the entire ERISA enactment was to protect the "anticipated benefits" of employees covered by pension plans, *Nachman, supra,* at 1733, 29 U.S.C. § 1001(a).

More specifically, § 4048, 29 U.S.C. § 1348 provides that the date of termination of a plan under § 1342 (termination by the PBGC) should be that date established by the PBGC and agreed to by the plan administrator. In the event that the PBGC and the administrator do not agree on a termination date, the date will be "established by the court." Unfortunately, the statute provides no guidance as to how the termination date should be established. In

fact, the term "termination" is nowhere defined in the statute.[1]

The problem of establishing a termination date, and the importance of properly selecting the appropriate date was discussed in some detail in *PBGC v. Heppenstall*, 633 F.2d 293 (3rd Cir. 1980). In the context of this case, the main significance of selecting a date is the effect on employer liability which different possible termination dates would have. Section 4062 of ERISA, 29 U.S.C. § 1362 provides for employer liability calculated on the net worth of the employer on a date not more than 120 days prior to the date of termination. Thus, where the net worth of the employer is undergoing significant changes, the termination date selected by the court could have a great effect on the liability of the employer for unfunded vested pension benefits.

In this case, the PBGC has requested a termination date of August 9, 1979. The PBGC orally agreed at trial, following the presentation of evidence, that August 10, 1979 would be a more appropriate date since the evidence revealed that Puffer-Hubbard totally ceased operations on August 10. The company and the creditor's committee have sought a termination date after December 27, 1979, in accordance with the notice of intent to terminate filed by the administrator of the plan on December 17, 1979. Puffer-Hubbard and the Creditor's Committee contend that 29 U.S.C. § 1341 provides that in voluntary terminations the termination date may not be earlier than ten days *after* the filing of the notice of intent to terminate.

Puffer-Hubbard's reading of the statute is completely unwarranted. Under § 1341 a voluntary termination may only occur when the plan assets are sufficient to pay all liabilities of the plan. When there is an insufficiency, as there uncontestably is in this case, the *PBGC* must terminate the plan under § 1342. In that case, the PBGC establishes the termination date, and, if the administrator does not agree, the court makes the final decision. Nothing in the statute limits the court's discretion in this matter to some date after the filing of a notice of intent to terminate.

Under *Heppenstall*, and in the absence of explicit statutory guidelines, the court must be guided by the purpose of Title IV in establishing a termination date. Since that purpose is to protect reasonable employee expectations in their pension benefits, a proper termination date would seem to be the date on which reasonable employee expectations ceased to accrue. The Third Circuit reached this conclusion in *Heppenstall*:

> . . . the earliest date which could properly be selected by the court is that date on which participant employees had some reasonable notice that PBGC was seeking termination, and thus that they no longer had a justifiable expectation in the accrual of vested pension rights.

*Heppenstall, supra* at 302. Furthermore, since no expectations of benefits can accrue after an employee ceases working, the cessation of all business operations would seem to be the latest date necessary to protect the employees and serve the purpose of the statute. *Heppenstall* reached an identical conclusion:

> Focusing on employee expectations, it seems clear that no employee had any justifiable expectation in a termination date later than May 31, 1979, when the employer ceased all operations. Thus assuming no retiree interests are involved, and perhaps even if they are, it seems unlikely that the selection of any termination date later than May 31, 1979, could be proper.

*Heppenstall, supra.*

Thus, since none of the parties are seeking a termination date prior to August 10,

---

1. The term is defined very generally in related Treasury regulations. 26 CFR § 1.401–6(b). ERISA often refers to the Treasury regulations and Title 26 of the U.S. Code in defining vesting and other standards for administration of the Act. The legislative history refers specifically to the Treasury definition of "termination," see remarks of Mr. Dent in Volume 120, Congressional Record, August 20, 1974, Part 22, at p. 29193. The Treasury regulations may therefore be looked to for guidance in determining what was meant by "termination" of a plan under ERISA. This opinion is consistent with the guidelines set forth in those regulations.

1979, when Puffer-Hubbard ceased all operations, and since that date necessarily protects the interests of the employees, and presumably minimizes the liability of the PBGC, August 10 is the appropriate termination date.

The court has already rejected one argument advanced by the defendants for a later termination date. See *infra.* The Creditor's Committee also argued that the date of filing of the complaint by the PBGC has some special significance and that the termination date should not be before that date. However, nothing in the statute or in *Heppenstall* places any significance on the date of filing of the complaint. *Heppenstall* specifically rejected any reliance on PBGC's decision to file a complaint in setting the termination date. The only possible relevance of the filing of the complaint would be the possible notice it might provide to the employees that the plan was to be terminated. However, when the business has ceased all operations prior to the filing of the complaint, even that significance is lost.

Therefore, the court concludes that August 10, 1979 is the appropriate date for termination of the Challenge Stamping and Porcelain Hourly Employees Pension Plan.

*Identity of Employer*

■ It is undisputed that from July 30, 1979, through the August 10 termination date, until August 27, 1979, Heinicke Instruments Co. owned all of the stock of CSP, Inc., which in turn owned all of the stock of Puffer-Hubbard. The PBGC contends that this makes Heinicke part of the control group of Puffer-Hubbard for purposes of employer liability under § 4062 of ERISA, 29 U.S.C. § 1362. Heinicke, as well as the other defendants, deny that Heinicke was part of the control group of Puffer-Hubbard.

This dispute arises because Section 4001 of ERISA, 29 U.S.C. § 1301 defines "employer" for purposes of Title IV to mean "trades or businesses (whether or not incorporated) which are under common control." That section also directs the PBGC to issue regulations concerning "common control"

which are consistent and coextensive with Treasury regulations issued under 26 U.S.C. § 414(c). In response to that directive the PBGC has adopted the Treasury regulations referred to as its own. These regulations, Temporary Treasury Regulation, 26 CFR § 11.414(c), provide that "common control" refers to "one or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest with a common parent organization..." A controlling interest is defined for corporations, as ownership of at least 80% of the total value of the stock of the corporation.

Heinicke, as owner of 100% of the stock of CSP, which in turn owned 100% of the stock of Puffer-Hubbard, comes within the literal terms of these regulations. The regulations do not require any similarity in the trades or businesses under common control, nor do they require the exercise of actual control over the operations of wholly-owned subsidiaries in order to bring a parent company within the control group. The court is not inclined to read such requirements into the regulations or the Congressional intent. However, the regulations must be tempered by some degree of reason in order to avoid totally unjust results. The regulations provide an objective test for determining the existence of a control group which avoids ad hoc consideration of subjective factors such as actual control. To that extent the regulations perform a laudatory function. However, when the literal terms of the regulations would impose a substantial liability on a company whose ownership interest was a mere paper formality, who *could not* exercise any control over the operations of the owned company or over the pension plan which was terminated, and whose ownership interest was rendered entirely worthless by the court-ordered sale of assets of the owned company a few days after it was acquired, the unjustness of the result compels us to examine the underlying purposes of the statute and regulations involved. *U.S. v. Ohio Barge Lines, Inc.,* 607 F.2d 624 (3rd Cir. 1979); *Consumers Union v. Heimann,* 589 F.2d 531 (D.C.Cir.1978); *Center for*

*National Policy Review v. Weinberger*, 502 F.2d 370 (D.C.Cir.1974).

In *PBGC v. Ouimet Corporation*, 630 F.2d 4 (1st Cir. 1980), the First Circuit recognized that the regulations imposed a stock ownership test for determining a "control group," and adopted a literal application of that test to the facts of the case. However, the Court did discuss why it saw "nothing unfair" in such an application in the circumstances presented:

> We are not persuaded that, because only one of a group of corporations under common control contributes to a plan, it is unjust to make the group responsible for the plan's deficit. The facts of this case illustrate why such a group should be treated as an integrated whole. Ouimet purchased Avon with full knowledge of the plan and its funding requirements. Ouimet participated in the labor negotiations resulting in greater pension benefits that contributed to the deficit. The Ouimet Group filed a consolidated tax return on which Avon contributions were deducted. We see nothing unfair in treating the Ouimet Group as a single employer.

*PBGC v. Ouimet, supra* at 12. In that case Ouimet had purchased Avon in 1968, and Avon had formed a subsidiary in 1972. Avon and its subsidiary ceased operations, and their pension plan was terminated, no earlier than 1975.

By contrast, Heinicke "purchased" the CSP stock almost five months *after* Puffer-Hubbard had filed its bankruptcy petition. At the time of the "purchase" Puffer-Hubbard was under the control of both the Bankruptcy Court and a court-appointed receiver. Heinicke *could not* have exercised any control over the operations of Puffer-Hubbard.[2] A week after Heinicke purchased the CSP stock, the assets of Puffer-Hubbard were sold by order of the Bankruptcy Court and Puffer-Hubbard ceased all operations. After August 9 Heinicke owned stock, but the company which the stock represented no longer existed. At the time that Heinicke "purchased" the CSP stock, all the parties involved recognized that the purchase would have no practical effect unless the Bankruptcy Court disapproved the sale of assets of Puffer-Hubbard. The "purchase" was a "contingent" purchase. By approving the sale of assets, the Court, in effect, rejected Heinicke's purchase of Puffer-Hubbard. The CSP stock and the Puffer-Hubbard stock were totally without value at that point and the return of the stock to Jared Dickens on August 27 was merely a formality.

The Court does not accept the concept that Congress intended the liability provisions of ERISA to extend so far as to include Heinicke under the circumstances of this case. Such a holding could discourage legitimate attempts to rehabilitate businesses, salvage assets and preserve jobs and pension benefits of employees. The purpose of the employer liability provisions, as disclosed by the legislative history, was to avoid employer abuse of the plan termination insurance program:

> The Committee recognizes that in order to provide adequate protection to employees against loss of vested benefits owing to premature plan termination, it is necessary for the insurance program to cover all forms of plan termination regardless of the circumstances giving rise to the termination. The Committee also recognized that some degree of employer liability was essential where the employer was not insolvent at the point of plan termination in order to preclude abuse by shifting the financial burden to the plan termination insurance program despite the fact that the employer had available funds to continue funding the plan.

1974 U.S. Code Congressional and Administrative News 4639, 4654, House Report 93–

---

**2.** The fact that Heinicke did not exercise any actual control over Puffer-Hubbard is, of course, not relevant, since actual control is not the test. What is relevant is the fact that Heinicke could not exercise any control because of Puffer-Hubbard's status in receiver-ship. The Bankruptcy court had complete legal control over all of Puffer-Hubbard's operations, including the Pension Plan. Thus, the CSP stock which Heinicke purchased did not carry with it the *possibility* of control which 100% stock ownership would normally entail.

533, Section 405. Obviously, the legislative purpose behind the employer liability provisions would not be served by the inclusion of Heinicke in the Puffer-Hubbard control group. Heinicke was never in a position to abuse the termination insurance program because (1) Puffer-Hubbard was in receivership at the time Heinicke acquired its ownership interest, (2) any practical effect of Heinicke's purchase of Puffer-Hubbard was contingent on Bankruptcy Court approval; and (3) the Bankruptcy Court rejected Heinicke's plan of reorganization and ordered the assets sold.

The court stresses that no per se rule is being adopted regarding the acquisition of the stock of bankrupt corporations. It is the whole conjunction of circumstances surrounding Heinicke's acquisition of the CSP stock which leads to the conclusion that it should not be included in a control group with CSP and Puffer-Hubbard.

*Conclusion*

It is the JUDGMENT and ORDER of this Court that:

1. The Challenge Stamping and Porcelain Company Hourly Employees Pension Plan should be terminated under the provisions of 29 U.S.C. § 1342(c) and Title IV of ERISA.

2. The PBGC is appointed permanent trustee of the Plan and is ordered to terminate the Plan in accordance with Title IV of ERISA. The PBGC is ordered to pay lump-sum benefits to the intervening participants in the amounts previously agreed to by the PBGC.

3. The date of termination of the Plan is declared to be August 10, 1979.

4. The employer who maintained the plan for purposes of employer liability under 29 U.S.C. § 1362 is declared to be CSP Company, Inc. and Puffer-Hubbard Products, Inc.

5. Heinicke Instruments Company is not to be considered to be an employer who maintained the Plan under § 1362, and to not have been under common control with Puffer-Hubbard Products, Inc. and CSP Company, Inc. on the date of termination of the Plan.