In Re BRANIFF AIRWAYS, INC., et al., Debtors.

BRANIFF INTERNATIONAL CORP., Braniff Airways, Inc.; Retirement Plan for Management Employees of Braniff Airways, Inc.; and Alan K. Stewart, William C. Oliver, and Steven S. Turoff, constituting the Retirement Committee of the Plan, Plaintiffs,

v.

INTERFIRST BANK, DALLAS, N.A. as Trustee; Charles M. Mathews, R.G. Peterson and K.L. Mullick on their own behalf and on behalf of all Plan beneficiaries; and Pension Benefit Guaranty Corp., Defendants.

Bankruptcy No. 482–0368, 482–0369.
Adv. No. 482–0339.

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

Nov. 8, 1982.

Melvin C. Garbow, David Bonderman, K. Peter Schmitt, Arnold & Porter, Washington, D.C., Jack H. Balzersen, Rochelle, King & Balzersen, Dallas, Tex., Michael Crames, Levin & Weintraub, New York City, for plaintiffs.

Charles Plenge, Johnson, Bramberg & Leeds, Dallas, Tex., Henry Rose, Mitchell L. Strickler, Lawrence F. Landgraff, Kent Cprek, Pension Benefit Guaranty Corp., Washington, D.C., Morgan Williams, Mehl, Williams & Cummings, Fort Worth, Tex., Barbara Houser, Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., for defendants.

### Memorandum Opinion

JOHN FLOWERS, Bankruptcy Judge.

This is a case to establish the termination date for a qualified pension plan governed by the provisions of the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001, et seq. The Pension Benefit Guaranty Corporation (PBGC) is central to ERISA's theme of providing guaranteed levels of benefits to pension plan participants. Operating as a governmental-insurer it is funded by premiums paid by the plans it insures. Termination of pension plans is governed by Subtitle C of the statute which allows the plan administrator and the PBGC to agree on a date of termination. 29 U.S.C. § 1348(1) and (2). In the event they are unable to agree § 1348(3) provides for the court to set the date of termination. This court has jurisdiction under 29 U.S.C. § 1348 and 28 U.S.C. § 1471.

I

The specific plan in question is the Retirement Plan for Management Employees of Braniff Airways Incorporated ("Management Plan"). It is one of several Braniff established which were in effect on May 13, 1982, when Braniff filed its petition under Chapter 11 of the Federal Bankruptcy Laws. In the months following May 13, representatives of Braniff, its attorneys and the PBGC, at various times, and without notice to the plan participants or the public, met and discussed the various plans. By letter dated August 20, 1982, Braniff notified the PBGC of its intention to voluntarily terminate four of the plans effective retroactively to the close of business on May 12, 1982, the date on which it terminated substantially all of its employees. Additionally, on August 20, notices were mailed to all plan participants informing them that Braniff had filed an intent to terminate the plans retroactively. On that same date, Braniff filed its Complaint for Declaratory, Injunctive and Interim Relief for each of the four plans including the Management Plan in issue here. The respective plan trustees and representative plan beneficiaries were named as defendants. Among other requested relief, Braniff asked the court to authorize it and the plan's retirement committee to take certain actions to implement a termination of the plan effective the close of business on May 12, 1982.

■ Hearings on Braniff's request for interim relief were held on August 26 and 27. While the cases on all four plans were not formally consolidated, all were heard simultaneously because of the need for an expedited hearing, the commonality of the legal points involved, and in the interest of judicial economy. On August 31 a Memo-

randum Opinion, rendered by this court, ordered reduction of the September pension payments to participants under the Management Plan to PBGC minimum guaranteed levels in order to preserve the status quo and preserve the assets for those who would eventually be entitled to benefits because it was believed at that time that the plan was "sufficient." Sufficiency in the ERISA context generally means the plan has sufficient assets to pay certain minimum statutory levels of benefits. At all times relevant to these proceedings it has been obvious that the plan could not pay the promised benefits to all participants.

On September 20 the plaintiff's request for class certification was granted certifying the instant action as a class action under Fed.R.Civ.P. 23(b)(1) and (2)[1] and defining two sub-classes of the Management Plan, consisting of plan participants currently receiving benefits and those vested but not yet in pay status. The latter group consisting mainly of those who have not yet reached retirement age. The PBGC was made a party defendant on September 15. On September 17, the PBGC notified all concerned that its position was that the proper termination date was August 30 rather than May 12. In establishing this as the date of termination the PBGC noted that 29 U.S.C. § 1341(a) specifically provides that in a voluntary termination case the plan administrator shall file a notice with the PBGC proposing a termination date "... which may not be earlier than 10 days after the filing of notice". Consequently, the PBGC, rather than void the notice of intent to terminate, chose to treat Braniff's notice as proposing, "by operation of law," a date of August 30, 1982. At this point the PBGC still believed the plan to be sufficient and so found in its September 17 letter. Unable to agree with the PBGC as to the date of termination, Braniff proceeded to pursue its complaint and requested this court, pursuant to 29 U.S.C. § 1348(3), to determine the appropriate date of termination. Shortly before trial the latest actuarial calculations established that the Man-

agement Plan was insufficient. While some final adjustments remain to be made all concerned agree that it would be an extremely remote possibility for the plan to be sufficient. The case was tried under a stipulation assuming insufficiency.

## II

The date selected for termination of the plan is important to each of the parties. The participants currently in pay status were paid full promised benefits for the months of June, July and August, even though the plan was apparently insufficient. If August 30 is selected as the date of termination those participants will not be subject to recoupment claims as they will be if May 12 is selected. Additionally, on the whole, those participants will receive greater monthly benefits in the future under the PBGC minimums based on an August 30 termination date. Plan participants who were employees and therefore not in pay status only benefit from the later date *if* they can continue to accrue benefits. Some unvested employees might also become vested in that period. However, it is undisputed that substantially all were terminated from employment on May 12. Since section 1.1(A)(14) and (16) of the Plan requires continued employment as a condition to benefit accrual, the earlier or later dates are immaterial to the terminated employees.

Braniff benefits from the earlier date because its potential liability for funding of the plan would be reduced. The PBGC's assertion of an August 30 termination date is the one most detrimental to it because it will have to pay plan participants at the higher benefit level. That date is also detrimental to the PBGC's right to recover from Braniff under 29 U.S.C. § 1362. That right, to recover the PBGC's losses as a result of the plan's insufficiency, is subject to a cap of 30% of Braniff's net worth in the 120 day period before termination. Based on an August 30th termination date the 120 day period would commence May 1, 1982, only 12 days before Braniff filed its

1. Made applicable to this matter by Bankruptcy Rule 723.

bankruptcy petition. It is probable that Braniff had little, if any, net worth during the entire 120 day period. However, the PBGC has indicated that it takes the position that its claim against Braniff may be an administrative claim entitled to priority treatment if August 30 rather than May 12 is selected. Braniff adamantly opposes this suggestion.

### III.

■ A plan administrator seeking to voluntarily terminate a pension plan must proceed pursuant to 29 U.S.C. § 1341. The procedural process requires that the administrator give the PBGC notice of its intent to terminate the plan as of a specific date. Following receipt of such notice the PBGC, by allocating plan assets according to 29 U.S.C. § 1344 priorities, determines whether the plan is sufficient. If found to be sufficient and the PBGC agrees to the termination date, barring any other legal impediments which may arise, the administrator proceeds with termination. If the PBGC determines the plan is insufficient to pay the minimum statutory level of obligations under the plan when due it then must notify the plan administrator of its finding and it must proceed to involuntarily terminate the plan under 29 U.S.C. § 1342. The date of termination for the plan is then the one which is established by the PBGC and agreed to by the plan administrator. 29 U.S.C. § 1348(2). In the event they do not agree to the date of termination under § 1341 or § 1342 then, under 29 U.S.C. § 1348(3), the court establishes the date.

### IV.

Braniff's position that the court should find the date of termination to be May 12, is based on the cases of *PBGC v. Heppenstall* 633 F.2d 293 (3rd Cir., 1980); *PBGC v. Dickens,* 535 F.Supp. 922 (W.D.Mich.1982); and *PBGC v. Broadway Maintenance Corp.,* No. 81 Civ. 3958 slip op. (S.D.N.Y. Sept. 16, 1982). It contends that each of these cases holds that a pension plan can be terminated retroactively by the court. Plan participants and the PBGC take the position that

a voluntary termination under 29 U.S.C. § 1341(a) absolutely sets the date of termination at ten days after the filing of the notice of intent to terminate. They distinguish the cited cases by pointing out that each involved an involuntary termination under § 1342 which does not contain a ten day notice rule.

■ The PBGC concedes that there may be situations where a retroactive termination date will be proper. However such retroactive terminations are only in exceptional circumstances which the PBGC will determine on a case by case basis and this, they say, is not one. The PBGC also asserts that the court should defer to their expertise and not permit retroactive termination absent their concurrence. I do not reach this issue for reasons that will become apparent. I start with the proposition that the ten day notice rule is in the statute for some purpose and accordingly, if possible, the statute should be interpreted consistent with it. As noted above, the statutory scheme is to allow the plan administrator to initiate voluntary termination proceedings and permit him to select a date which is not earlier than ten days after notice to the PBGC of his intent to terminate. 28 U.S.C. § 1341(a). If, during the course of its deliberations, the PBGC determines the plan is insufficient, thus requiring potential funding from the PBGC's insurance fund, the PBGC *must* begin involuntary termination pursuant to § 1342, which does not contain a ten day notice rule. There is logic to this scheme because the date selected then assumes importance to the PBGC in light of their potential liability and recoupment rights. Congress, by eliminating the ten day notice rule did not bind the PBGC by the plan administrator's choice of a date of termination in the cases in which the PBGC has a financial stake. The statute contains a safeguard in § 1348(3) which allows the court to set the date in the event the PBGC and the plan administrator cannot agree. While § 1348 does not contain the limiting language of § 1341(a) they should be read together. Accordingly, I hold that in a voluntary case under § 1341

where the plan assets are sufficient the date of termination must not be earlier than ten days after notice of termination is given to the PBGC whether that date is agreed to by the parties under § 1341 or set by the court under § 1348(3). When the date is set under the involuntary termination procedures, the parties and the court are not limited by the ten day notice rule. This result harmonizes with all the cases.

The plan participants point to the language in section 5.5 of the Management Plan which also requires ten days notice before termination as an additional reason why no date earlier than August 30th can be selected. That provision is identical to the statutory provision and should be interpreted the same as the statute. The termination date is of great significance to all parties and the statutory scheme outlined by Congress must be adhered to.

█ Applying this interpretation to the case at hand the facts show that the plan administrator, on August 20, 1982, initiated a voluntary termination under § 1341(a). However, during the course of the proceedings it became apparent that the plan was not sufficient. Strictly following § 1341(c) the PBGC must then proceed with involuntary termination. This they have not done. Indeed, it was not necessary because the question of termination was already before this court. I will treat the matter as one of involuntary termination under § 1342 from September 21, 1982, the date the parties discovered the plan's assets were insufficient. Accordingly the court is free to set a termination date unimpeded by the ten day notice rule of § 1341(a). The participants argument that since the proceeding commenced as a voluntary termination it must therefore continue in that mode requires the court to ignore the realities of the case and places undue emphasis on form.

V

As a result of Braniff and the PBGC's inability to agree on a date of termination for the Management Plan, this court is faced with the question of selecting such date under 29 U.S.C. § 1348(3). Unfortu-nately the statute is silent as to what the court should consider or how such date should be determined. Consequently, in selecting a date of termination, I will consider the relevant case law.

There are only three cases in which courts have, under 29 U.S.C. § 1348(3), selected dates of termination for pension plans. In *Heppenstall,* supra, the first involuntary case commenced by the PBGC, the employer had notified the PBGC that termination was necessary but that it was unable to voluntarily terminate the plan because it interpreted its collective bargaining agreement with the union to prohibit such action. In the period between the PBGC's initiation of the involuntary termination and the lower court's selection of a date of termination the employer on May 31, 1979, ceased all operations and terminated all employees. *Id.* at 298. In reviewing the lower court's decision which set the date of termination after the date the employer ceased all operations and terminated all employees the Third Circuit discussed the proper method for setting a termination date and arrived at a three step process. The first step was to identify the respective interests of the PBGC and the plan participants. The court identified the interest of the PBGC in § 1342 to be the protection of its insurance fund. The court specifically limited its identification of the interests of the participants to those actively employed because there was no evidence that the retired participants in pay status would be adversely affected by the date selected. The court also noted that the interests of the employer were not to be considered. Based upon its identification of the interests to be protected the court proceeded to the second step which was to determine the dates which most protected those respective interests. It reasoned that an early date of termination maximizes protection to the PBGC because the possibility of recovery from the employer would be greater; and, a later date maximizes the employee interests because the longer the employment period extends more employees will become vested and the right of vested employees will also

increase. To convert this from the abstract to specific dates the court used as its benchmark the employees expectations. The court thus determined the parameters to be: (1) earliest date—the date the employees had some notice the PBGC intended to terminate the plan; (2) the latest date—the date all employees were discharged and business operations terminated. For the third and final step, balancing the interests and setting the date of termination, the court remanded the case to the trial court.

In *Dickens* supra, which followed Heppenstall it became clear the possible termination date parameters will vary with the facts of each case and in some cases a later date may even benefit the PBGC. In *Dickens* it happened that the earliest significant date, which was August 10, 1979, benefited both the employees and the PBGC equally. That was the date the company ceased all operations and terminated all the employees. The creditors committee asserted a later date which the court rejected in favor of August 10. The court said:

> Thus, since none of the parties are seeking a termination date prior to August 10, 1979, when Puff-Hubbard ceased all operations, and since that date necessarily protects the interests of the employees, and presumably minimizes the liability of the PBGC, August 10 is the appropriate termination date.

*Dickens,* supra at *925–26.*

In *Broadway Maintenance,* supra, the court also focused on notice to employees as affecting expectations in establishing a termination date. The court did not specifically refer to the PBGC/employee interests test. It held that the date should be the earliest of: (1) ten days after the employer advises the PBGC of the failing condition of the plan (which in that case was March, 1981) or (2) the date the PBGC first recognizes the plan's financial problem and can notify employees of proposed termination (December, 1980) or (3) the date employees receive notice from the employer. Since the employees had not received notice from the employer the court selected the earlier of the other two dates. Apparently, the

employees had not been terminated and the company had not ceased operations.

Braniff's assertion that these cases stand for the proposition that the termination date must be the date all or substantially all of the employees are terminated is short of the mark. That date will probably be the date of maximum benefit to the employee interests in most cases, but not always. It does not take into account the interests of pay status retirees who are not currently employed. It may or may not be the most advantageous date for the PBGC. In setting the termination date here I will follow the three step analysis of *Heppenstall,* supra, and identify the interests of all of the plan participants and the PBGC, establish the parameters which maximizes those respective interests, and set the termination date accordingly.

In this case it would be in the best interest of the PBGC to select an earlier date because that would reduce the liability of the PBGC's fund and increase the probability of recovery from Braniff. However, the PBGC by its own choice has, as a result of a strict construction of § 1341(a), determined that August 30th is the proper date of termination, even though its finding of insufficiency by operation of § 1341(c) converted the termination process over into § 1342.

With respect to the plan participants as a whole it is indisputable that the latest possible termination date maximizes their interests.

In setting the maximum date which protects the plan participants I turn to the question of the participants' expectations. It is important to keep in mind that the participants in the plan in issue here fall into two distinct categories: employees and retirees. When a plan's only group of participants are all current employees their expectations regarding their employment and continued participation under a pension plan would be identical. Consequently, once their employment status ceased so would further plan participation and there would be no justifiable expectation in the accrual of additional pension rights. That

is not the case here. Here we must also consider the retirees whose expectations cannot be linked to any employment because they are no longer employed. In *Heppenstall* it was assumed that no adverse retiree interests were involved and only employees' expectations were dealt with. Indeed, the court carefully took notice of this fact in saying

> The termination date affects retirees only to the extent that the payments guaranteed under ERISA are less than they are currently receiving, or to the extent that benefits already received may be recaptured under 29 U.S.C. § 1345. There is nothing in the record disclosing whether any retirees will be affected.

*PBGC v. Heppenstall,* supra at 301. It is thus clear that the court must ascertain and concern itself with the plan participants' expectations in continuation of the plan and not expectations of employment. The evidence here is undisputed that retirees will be more adversely affected by the selection of a May 12 termination date rather than a later one.

▮ The notice given by Braniff on May 12 to current employees only was one which effectively terminated their employment.[2] There was no notice at that time that Braniff was also intending to terminate the Management Plan. To read the May 12 notice of termination so broadly as to allow it to be interpreted as a termination of the pension plan, which in fact continued in effect and made full plan payments for the following three months, is unreasonable and without merit. Retirees, who had no knowledge of the level of funding in the plan, may have reasonably believed they were unaffected by Braniff's cessation of operations.

Another factor which distinguishes Braniff from *Heppenstall* and *Dickens* is that Braniff never totally ceased operations. In fact it proceeded to file its Chapter 11 petition and operate as a debtor in possession continuing publicly to emphasize its intent to reorganize thereby holding out some hope that at least some employees might be rehired for some new operation. This hope continues even today with Braniff's announcement of a potential joint venture with PSA which at this stage anticipates using Braniff equipment and some personnel.

It is possible that May 12 could have been the earliest possible date of termination but for that result all plan participants should have received some form of notice of termination of the plan because that is the only way all the participants "justifiable expectations" in the continuation of the plan could effectively be extinguished.

It has not been suggested and is not practicable, perhaps not even possible, to have more than one termination date such as, May 12 for current employees and a later date for retirees. The possibility of multiple termination dates for one plan would unduly complicate the situation.

▮ Braniff mailed its Notice of Intent to Terminate to all plan participants on Friday, August 20. This was the first notice received by all participants. Witnesses at the trial on the merits stated that they received their copy of this notice on or about the following Monday, August 23. This is a reasonable period within which plan participants would have received the notice. It is the opinion of this court that as of that date all the plan participants would no longer have a justifiable expecta-

2. The PBGC's position that Braniff employees were not terminated and continued to accrue benefits after May 12 is not supported by the facts. Substantially all of Braniff's employees were unconditionally and permanently terminated when they received the mailgram of May 12. However, approximately 225 of the terminated employees were asked to and did return to work with about 160 still employed today. Only the members of this select group which did in fact continue to work accured *any* pen-

sion benefits after May 12. There can be no doubt that the sequence of events from May 12 on (being told to pack up their belongings and go home, not to return to work the next day unless specifically requested, to look for other employment, the securing of Braniff's facilities, the announcements made at press conferences) all clearly indicated that they were no longer subject to Braniff's control and became part of the general labor pool. In basic terms, they simply were no longer Braniff employees.

tion in the continuation of the plan or the accrual of additional benefits.

Therefore, the parameters, per my analysis of *Heppenstall* above, are August 23, 1982, the last day all plan participants could reasonably expect further plan participation, and August 30, 1982, the date asserted by the PBGC as a result of its strict interpretation of § 1342(a). Turning to the final step, it is clear that August 23, in addition to being the date participants' expectations were effectively extinguished, is also more advantageous to the PBGC. Therefore, it is the order of this court that the date of termination be established as August 23, 1982.