KRUPANSKY, Circuit Judge.
This is an appeal by the Pension Benefit Guaranty Corp. (PBGC), the government corporation which administers employee pension plans when an employer terminates operations, from a decision of Chief Judge Wendell Miles of the Western District of Michigan which held that Heinicke Instruments Co. (Heinicke) did not control Puffer-Hubbard Products, Inc. (formerly known as Challenge Stamping and Porcelain Co.) at the time Puffer-Hubbard ceased operations, and, therefore, Heinicke was not liable for the unfunded liability of Puffer-Hubbard’s pension plan. 535 F.Supp. 922. This appeal raises an issue of first impression as to the application of PBGC’s regulation defining the term “control” for the purpose of fixing responsibility for underfunded pension plans. 29 U.S.C. § 1362 (Title IV of ERI-SA).
The operative facts, as comprehensively delineated in the trial court’s memorandum opinion, are not disputed. The district judge made the following findings:
The Challenge Stamping and Porcelain Company Hourly Employees Pension Plan was established on August 25, 1959 and continued to be maintained by Puffer-Hubbard for the benefit of its employees. This Plan was at all relevant times qualified under applicable provisions of the Internal Revenue Code, and was subject to the provisions of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., including Title IV, Section 4001 et seq. of the Act, the Plan Termination Insurance Program. The benefits provided by the Plan are non-forfeitable benefits insured by the PBGC pursuant to Section 4022(a) of ERISA, 29 U.S.C. § 1332(a). The Pension Plan was substantially underfunded at all times relevant to this action.
On or about March 11, 1979, Jared Dickens, a former employee of Puffer-Hubbard, purchased 100% of the stock of CSP[1] for $1.00. At that time most of Puffer-Hubbard’s production workers had already been laid off. Dickens immediately laid off all workers and filed Chapter XI bankruptcy proceedings for Puffer-Hubbard on March 26, 1979. The next day Dickens restarted production with capital obtained by selling the building owned by Puffer-Hubbard and leasing it back. The workers continued to be employed under the existing union contract including the Pension Plan.
Dickens was contacted by Heinicke Instruments shortly after he purchased CSP and Puffer-Hubbard. Heinicke manufactured products complementary to those of Puffer-Hubbard and was interested in acquiring Puffer-Hubbard in order to broaden Heinicke’s product line. Dickens understood Heinicke’s interest to be in continuing Puffer-Hubbard’s operation in Grand Haven. Although Heinicke’s interest continued over the next few months, no sale was consummated because Puffer-Hubbard could not provide accurate data concerning its financial condition. Heinicke was aware that Puffer-Hubbard had filed bankruptcy proceedings.
Dickens first contacted PBGC in April, 1979 in order to solicit PBGC’s help in salvaging the company and, thus, the Pension Plan. There is no record of any action taken by PBGC at that time.
Puffer-Hubbard was operated as a Debtor-in-Possession under the jurisdiction of the Bankruptcy Court from March 26,1979 until April 26,1979. On April 26 the Bankruptcy Court appointed a receiver, Maurice Edleman, who took over operations of the company. Edleman continued manufacturing, employing Dickens to act as the on-site manager of the company. The receiver operated the company according to the “Amended Definitive Order” of the Bankruptcy Court, dated *148 April 26, which required regular accounting to the Court of actions taken by the receiver.
Puffer-Hubbard continued to negotiate with prospective purchasers of the company or of its assets. On June 24, 1979 Rheem Manufacturing Co. tendered an offer to purchase the assets of Puffer-Hubbard for $710,000. Dickens accepted this offer on behalf of Puffer-Hubbard, subject to approval of the Bankruptcy Court. On July 26, Puffer-Hubbard petitioned the Bankruptcy Court for approval of the sale of assets to Rheem.
When Heinicke learned of the proposed sale of assets it realized that its plan of reorganizing and continuing Puffer-Hubbard operations would have to be presented to the Bankruptcy Court in order to forestall the proposed sale. In furtherance of this purpose Heinicke purchased all of the stock of CSP (which owned all of the stock of Puffer-Hubbard) on July 30, 1979, from Dickens for the sum of $1.00. At the same time it entered into an agreement to employ Dickens as a manager for the “rehabilitation and reorganization of Puffer-Hubbard Products, Inc.” Both Heinicke and Dickens recognized that the CSP stock would be worthless, and the employment contract would be void, unless the Bankruptcy Court disapproved the sale of assets to Rheem and allowed Heinicke to take over and operate Puffer-Hubbard.
The Bankruptcy Court held a hearing on August 6, 1979 at which it approved the sale to Rheem over the objections of Heinicke, Dickens, and the State of Michigan. The order approving the sale was issued on August 9,1979 and Puffer-Hubbard ceased all operations on August 10, 1979. No employees worked, no pension benefits occurred, and no contributions to the plan were made for any period after August 10.
Subsequent to the cessation of Puffer-Hubbard operations Dickens was advised by his attorney that he should seek return of the CSP stock for unrelated legal reasons. On August 27, 1979 Heinicke returned the stock to Dickens and cancelled the employment agreement purportedly because the conditions of the sale and agreement had not been met due to the sale to Rheem. Dickens approved the cancellation of his employment contract.
On November 1, 1979 the Bankruptcy Court authorized termination of the Pension Plan. Notice of intent to terminate the Plan was filed with PBGC on December 17, 1979 asking that the termination date be established as December 15, 1979. On June 24, 1980 the PBGC issued its Notice of Determination notifying the Board of Administration of the Pension Plan that the assets of the Plan were insufficient to discharge all of the obligations of the Plan. The PBGC further notified the Board that it intended to institute termination proceedings in accordance with section 4042 of ERISA, 29 U.S.C., § 1342. The PBGC filed this action on June 25, 1980.
The termination action initiated by the PBGC included a demand upon Heinicke, based upon authority granted in 29 U.S.C. § 1362, for a recovery from Heinicke, as an employer who maintained a pension plan that was terminated with unfunded liabilities, of:
[A]n amount equal to the lesser of—
(1) the excess of—
(A) the current value of the plan’s*' benefits guaranteed under this sub-chapter on the date of termination over
(B) the current value of the plan’s assets allocable to such benefits on the date of termination, or
(2) 30 percent of the net worth of the employer * * *.
29 U.S.C. § 1362.
The ERISA statute defines an “employer” as “trades or businesses (whether or not incorporated) which are under common control.” 29 U.S.C. § 1301. In turn, the PBGC has adopted, pursuant to statute, Treasury Regulation 26 C.F.R. § 11.414(c)-(2)(b)(l) which states that “common control” refers to “one or more chains or organizations conducting trades or businesses connected through ownership of a control *149 ling interest with a common parent organization * * *.” 26 C.F.R. § 11.414(c)-2(b)(2)(A) further provides that a “controlling interest” means:
(A) In the case of the organization which is a corporation, ownership of stock possessing at least 80 percent of the total combined voting of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation.
At the district court, the PBGC asserted that Heinicke’s 100 percent ownership of Puffer-Hubbard’s corporate parent, CSP, put Heinicke “in control” of Puffer-Hubbard on the date the bankruptcy court authorized termination of the pension plan and rendered Heinicke liable for any underfunding in the plan up to 30 percent of its net worth. Judge Miles disagreed and stated:
Heinicke “purchased” the CSP stock almost five months after Puffer-Hubbard had filed its bankruptcy petition. At the time of the “purchase” Puffer-Hubbard was under the control of both the Bankruptcy Court and a court-appointed receiver. Heinicke could not have exercised any control over the operations of Puffer-Hubbard. A week after Heinicke purchased the CSP stock, the assets of Puffer-Hubbard were sold by order of the Bankruptcy Court and Puffer-Hubbard ceased all operations. After August 9, Heinicke owned stock, but the company which the stock represented no longer existed. At the time that Heinicke “purchased” the CSP stock, all the parties involved recognized the purchase would have no practical effect unless the Bankruptcy Court disapproved the sale of assets of Puffer-Hubbard. The “purchase” was a “contingent” purchase. By approving the sale of assets, the Court, in effect, rejected Heinicke’s purchase of Puffer-Hubbard. The CSP stock and the Puffer-Hubbard stock were totally without value at that point and the return of the stock to Jared Dickens on August 27 was merely a formality.
* * * * * *
Obviously, the legislative purpose behind the employer liability provisions would not be served by the inclusion of Heinicke in the Puffer-Hubbard control group. Heinicke was never in a position to abuse the termination insurance program because (1) Puffer-Hubbard was in receivership at the time Heinicke acquired its ownership interest; (2) any practical effect of Heinicke’s purchase of Puffer-Hubbard was contingent on Bankruptcy Court approval; and (3) the Bankruptcy Court rejected Heinicke’s plan of reorganization and ordered the assets sold.
The court stresses that no per se rule is being adopted regarding the acquisition of the stock of bankrupt corporations. It is the whole conjunction of circumstances surrounding Heinicke’s acquisition of the CSP stock which leads to the conclusion that it should not be included in a control group with CSP and Puffer-Hubbard.
(Footnote omitted).
The sole issue confronting this Court is the propriety of the trial court’s ruling that Puffer-Hubbard was not under the “control” of Heinicke on the date of plan termination, notwithstanding that Heinicke owned all of the stock of CSP, the debtor’s corporate parent.
As Judge Miles’ opinion makes clear, Heinicke met the “literal terms” of the regulation defining a controlling interest in a terminated company in that Heinicke owned more than 80% of the stock of Puffer-Hubbard’s corporate parent, CSP, which in turn directly held more than 80% of the shares in Puffer-Hubbard. The government essentially asserts that once conformity to the regulation is established no further inquiry is required or warranted, and that the trial judge erred by “legislating] a new subjective rule” in place of the objective stock ownership test for determining common corporate control. The appellees, and the amicus U.S. Chamber of Commerce, contend that while Congress clearly intend *150 ed to prevent corporations from evading responsibilities toward funding their pension plans by manipulating the corporate form, a “wooden application” of the stock ownership rule in this case would actually frustrate the goal of encouraging the private sector to assume control of failing companies and their pension plans, thereby increasing the number of plans that would be administered by the PBGC as the guarantor of last resort.
Initially, it must be emphasized that Judge Miles did not declare the 80% stock ownership rule to be invalid as a test for control or inconsistent with the intent of Congress; rather, the appropriately limited holding below merely noted that since the 80% stock ownership rule logically presupposes that ownership of stock affords a measure of control, the regulation should not be applied where the facts conclusively demonstrate that the stockholder “could not exercise any control over the operations of the owned company or over the pension plan.” Accordingly, the issue is one of statutory construction and not, as the PBGC would have it, judicial legislation; i.e., the relevant regulatory test is not at issue, only the application of that rule in the particular case now at bar is before the Court.
Generally, deference is due to an agency’s interpretation of a statute involving its area of expertise. United States v. Cornell, 389 U.S. 299, 307, 88 S.Ct. 445, 449, 19 L.Ed.2d 537 (1967). However, this deference only “sets the framework for judicial analysis; it does not displace it.” United States v. Cartwright, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973). The standard of review for considering an agency’s application of its regulation has long been whether the regulation or interpretation “harmonizes with the plain language of the statute, its origin and its purpose.” Rowan Companies, Inc. v. United States, 452 U.S. 247, 101 S.Ct. 2288, 2292, 68 L.Ed.2d 814 (1981). Accord, United States v. Vogel Fertilizer Co., 455 U.S. 16, 102 S.Ct. 821, 828, 70 L.Ed.2d 792 (1982) (“[It] is not a reasonable statutory interpretation unless it harmonizes with the statute’s ‘origin and purpose.’ ”)
This Court defined the purpose of Title IV of ERISA in A-T-O, Inc. v. Pension Benefit Guaranty Corp., 634 F.2d 1013,1025 (6th Cir.1980):
The purposes of Title IV are stated expressly in § 1302(a): 1) to encourage the operation and continuation of private pension plans; 2) to protect employees’ pension benefits; and 3) to keep the insurance premiums paid to the PBGC as low as possible. In addition, the legislative history demonstrates the Congressional purpose of imposing employer liability in order to prevent employers from abusing the termination insurance program by shifting their financial burdens under pension plans to the PBGC or by making unrealistic promises to employees. H.R.Conf.Rep. No. 93-1280 [1974] U.S. Code Cong. & Ad.News at pp. 5148, 5161; S.Rep. No. 93-383 [1974] U.S.Code Cong. & Ad.News at pp. 4911, 4964, 4971; S.Rep. No. 93-127 [1974] U.S.Code Cong. & Ad.News at p. 4862; H.R.Rep. No. 93-533 [1974] U.S.Code Cong. & Ad.News at p. 4654.
Moreover, it is clear that Congress intended to further its principal purpose of fostering responsibly operated private pension plans by preventing otherwise solvent employers from shifting their pension burdens to the government when the employer terminated a business. Senator Williams, one of the primary draftsmen of the legislation, identified the type of employer behavior the bill sought to preclude:
Since there would be a possibility of abuse by solvent employers who terminate a plan and shift the financial burden to the insurance program, notwithstanding their own financial ability to continue funding the plan, the conference bill imposes liability on employers whose plans terminate, to reimburse the program for benefits paid by the corporation. This liability extends to 30 percent of the employer’s net worth. However, the bill does provide that employers will be permitted to exercise an option to obtain *151 additional insurance to cover such contingent liability.
120 Cong.Rec., S15737 (daily ed. Aug. 22, 1974) (remarks of Sen. Williams), reprinted in [1974] U.S.Code Cong. & Ad.News 4639, 5038, 5185.
One method elected by the Congress to inhibit the shift of pension funding to the government by solvent employers who possess the “financial ability to continue funding the plan” id. (emphasis added), was to mandate that “all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer”, and that the definition of “common control” in ERISA’s regulations “be consistent and coextensive with” Treasury regulations which, as noted, equate control of a corporation with ownership of 80% of the voting stock. 29 U.S.C. § 1301(b); 26 C.F.R. § 11.414(c)-2(b)(2)(A). Those Treasury regulations, and the authorizing statute, have been construed by the Supreme Court in Vogel Fertilizer, supra, as representing a clear Congressional intent to create an “objective test” for determining control, based upon a “sharp dividing line” of 80% stock ownership, to replace the previous “subjective” test for common control, which focused on determining whether the “major purpose” of organizing into multiple corporations was to obtain “tax benefits resulting from multiple use of the surtax exemption.” Id., 102 S.Ct. at 828, n. 9. Simply put, Congress sought to determine the plain fact of control, rather than any subjective motives or reasons for control or relinquishment of control.
It seems apparent that by this objective test to determine common control Congress was seeking to place responsibility (and liability) upon the party actually in control so as to insure that control would be exercised responsibly and for proper reasons; i.e., no shifting of pension obligations, no multiple use of small business tax relief. There is no support for a view that Congress’s chief intent in employing this test in ERISA was to invade the deepest pocket in a business failure, regardless of its responsibility “to continue funding” a pension plan of a controlled company. The purpose of the 80% regulation is obviously to find the party in control. When, by operation of bankruptcy law, a party is actually denied control, there is no reason to apply the regulation.
It must be stressed that this conclusion neither invalidates the regulation at issue nor establishes a per se rule applicable in all bankruptcies; rather, this Court holds that the trial judge correctly determined that CSP stock did not provide any measure of control over Puffer-Hubbard at the date of termination, and thus the regulation did not apply. The judgment below is accordingly AFFIRMED.

. CSP Company, Inc. is a holding company incorporated in Delaware with principal offices in Illinois. At all times relevant to this action CSP owned 100% of the stock of Puffer-Hubbard. This was the only asset of CSP.