706 F.2d 1289
 4 Employee Benefits Ca 1396
 UNITED STEELWORKERS OF AMERICA, AFL-CIO AND ITS LOCAL 4805,
and James Hopkins
v.
HARRIS & SONS STEEL COMPANY, Jerome Harris, Morris Garnet,
and Irving Gold
and
HARRIS & SONS STEEL COMPANY, Jerome Harris and Morris
Garnet, Third Party Plaintiffs,
v.
PENSION BENEFIT GUARANTY CORPORATION, Third Party Defendants.
PENSION BENEFIT GUARANTY CORPORATION
v.
HARRIS AND SONS STEEL COMPANY.
APPEAL OF PENSION BENEFIT GUARANTY CORPORATION, Plaintiff in
 C.A. No. 80-3106.
 No. 82-5369.
 United States Court of Appeals,
Third Circuit.
 Argued March 14, 1983.
Decided April 28, 1983.
 
 Henry Rose, Gen. Counsel, James N. Dulcan, Asst. Gen. Counsel, Lois Bruckner Parks (argued), Trial Atty., Joan Segal, Pension Benefit Guaranty Corp., Washington, D.C., for appellant.
 Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney, P.A., Newark, N.J.; Todd M. Sahner (argued), Newark, N.J., on brief for Harris and Sons Steel Co.
 Bernard Kleiman, Chicago, Ill., Carl Frankel, Pittsburgh, Pa., Elliot Bredhoff, Jeffrey L. Gibbs, Washington, D.C., for the United Steelworkers of America, AFL-CIO, amicus curiae.
 Before ADAMS, GARTH,* and VAN DUSEN, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 The Pension Benefit Guaranty Corporation (PBGC), a government agency established by the Employee Retirement Income Security Act of 1974 (ERISA), appeals from a district court determination that the Harris & Sons Steel Company Pension Plan (the Plan) terminated in significant part in July 1972. It is undisputed that the Plan ended completely on August 15, 1976; the case centers on whether the greater portion of the Plan had already ceased to exist approximately four years earlier. The holding that most of the Plan ended in July 1972 was predicated on the stipulated fact that Harris moved to a new facility at that time and discharged most of its former employees. This appeal turns principally on whether the district court correctly relied on tax principles to ascertain that the 1972 events constituted a partial termination, or whether instead the district court should have treated the question as involving the interpretation of the terms of the Plan. If tax principles are not controlling, then there was no partial termination in July 1972.
 
 
 2
 The termination date is crucial because the Plan assets appear to be inadequate to pay the vested pension benefits of Plan participants, and, if the Plan terminated after September 1, 1974, then ERISA requires the PBGC to assure that, within certain limits, the participants will receive their anticipated benefits despite the insufficiency of Plan funds. ERISA does not provide PBGC insurance for pension plans terminated in 1972, but does enable the PBGC to guarantee benefits to participants in plans continuing after this date even if those participants had ended their employment at an earlier time. PBGC seeks here to carry out its statutory mandate to insure pension benefits; it argues that the 1972 events are irrelevant and that the entire Plan survived until 1976. Harris expects, based upon ERISA, that it will be required to reimburse the PBGC for at least some portion of the payments that PBGC makes to the Plan participants, and therefore opposes the PBGC's view that the events in 1972 did not partially terminate the Plan in any relevant sense. There is no contention by Harris that the partial termination alleged to have occurred in 1972 divested participants of any rights to benefits; nonetheless Harris' position would have the effect of depriving many participants of the benefits that are due them under the Plan.
 
 
 3
 We hold that it would be at variance with the language and purposes of ERISA to determine that there was, in any relevant sense, a partial termination in 1972. Because no part of the Plan terminated until August 15, 1976, the PBGC is statutorily authorized to guarantee benefits of participants whose employment was ended during or before July 1972.
 
 I.
 
 4
 The basic facts of this controversy are not in dispute. In 1964, Harris and the United Steelworkers of America (the Union) entered into an agreement establishing the Plan on behalf of members of Local 4805.[1] The Plan governed the rights to pension benefits of Harris' employees who were members of the Local. All employees covered by the Plan worked at Harris' plant in Harrison, New Jersey. The Plan provided, among other things, that any employee whose service to the company was terminated after ten continuous years would be eligible "to receive a deferred vested retirement pension" by making an application upon reaching retirement age.
 
 
 5
 Subject to some exceptions, monthly pension benefits were to be calculated by multiplying years of continuous service by a dollar amount. Harris was designated as the Plan administrator (see 29 U.S.C. Sec. 1002(16)(A)(i)), and was obligated to contribute an agreed amount of money to a pension fund (trust) for each hour worked by a Union employee. The term of the initial pension plan agreement was three years, but three subsequent agreements continued the Plan until August 15, 1976.
 
 
 6
 In 1965, the Internal Revenue Service (IRS) determined that the Plan was "qualified" for certain tax benefits by virtue of the fact that the requirements of I.R.C. Sec. 401(a) were met.[2] The determination letter advised Harris that the IRS was "to be notified in the event of ... termination of the plan." The IRS never redetermined the Plan's qualification, and the 1965 letter was never superceded. In 1971, the Connecticut General Life Insurance Company (Connecticut General) issued a group annuity contract to Harris for the purpose of funding the Plan. Thereafter until April 1974 Harris paid its contributions under the Plan to Connecticut General.
 
 
 7
 Harris opened a plant in Camden, New Jersey in January 1972, and began to transfer operations from Harrison to the new facility. All Union employees at the Harrison plant were offered positions in Camden, but only five of approximately fifty-five employees took advantage of the offer.[3] In June, 1972, the Camden employees elected to be represented by Local 4805, the same local that represented the Harrison employees. Harris recognized the Union as the exclusive bargaining agent of the Camden employees, and agreed to the coverage of these employees under the existing collective-bargaining and pension agreements. In July, 1972, the Harrison plant was closed.
 
 
 8
 Throughout this present litigation, Harris has taken the position that because a significant percentage of its employees was effectively excluded from the Plan in July, 1972, the Plan terminated at that time as to all employees who did not transfer from Harris to Camden. The terms of the Plan, however, did not state that the Plan should be considered to have ended, in whole or in part, upon the occurrence of events such as took place in 1972. Furthermore, in 1972, and until 1976, Harris failed to indicate in any way that it considered the Plan partially terminated. Harris did not notify the Union, the employees, or the IRS of any termination. Nor did it amend the Plan or the Group Annuity Contract. Benefit increases under the Plan, which were scheduled to go into effect shortly after the Harrison plant closed, were in fact implemented. Harris and the Union agreed in August 1973 to extend the Plan for three additional years, with no apparent break in the continuity of the Plan.
 
 
 9
 Several employees with deferred vested rights who had ceased working for Harris by the time of the Harrison plant closure reached retirement age and applied for benefits between 1972 and 1974. Consonant with the Plan, and tending to belie any claim of a partial termination, Harris purchased a retirement annuity for each of these former employees from the Plan assets held by Connecticut General. The Union became concerned, however, that the purchase of these annuities was rapidly draining the pension fund. Because of a dramatic decrease in the number of its employees, Harris' contributions under the Plan had greatly diminished. The relatively small contributions made on behalf of the Camden employees were being utilized to help fund annuities for the Harrison employees, and the Union feared that no funds would be available by the time the Camden workers reached retirement age.[4] In April 1974 the Union therefore requested that Harris withhold payments to Connecticut General and place such contributions in an escrow account until further notice. The request apparently was intended to prevent any further commingling of funds contributed on behalf of the Camden employees with those previously contributed. Harris, acceding to this request, made no further contributions.[5]
 
 
 10
 1974 was also the year in which Congress enacted ERISA, Pub.L. No. 93-406, 88 Stat. 829 (1974). Title IV of ERISA, which established the PBGC and the insurance schema which the PBGC implements, authorizes insurance coverage of participants whose pension plans terminated after September 1, 1974. See 29 U.S.C. Sec. 1461 (Supp. V 1981) and Nachman Corp. v. PBGC, 446 U.S. 359, 382, 100 S.Ct. 1723, 1736, 64 L.Ed.2d 354 (1980).[6] Thus, if the Plan terminated in 1972, benefits to participants are uninsured. If the Plan terminated after September 1, 1974, then, within certain limits, PBGC can guarantee the payment of all vested benefits.[7]
 
 
 11
 On July 30, 1976, four years after the Harrison plant closed and two years after PBGC insurance coverage of the Plan commenced, Harris for the first time informed Plan participants that it had decided to terminate the Plan and that it was submitting to the PBGC a "Notice of Intent to Terminate the Plan" pursuant to 29 U.S.C. Sec. 1341(a).[8] The Notice of Intent to Terminate, filed by Harris on August 2, 1976 in its capacity as plan administrator, specified August 10, 1976 as the termination date, but reserved the right to submit a memorandum arguing that the termination had actually occurred earlier. The PBGC on August 27, 1980 advised Harris that it was unable to calculate that the Plan assets were sufficient to pay, when due, benefits insured by the PBGC. At the same time the PBGC also informed Harris that it planned to commence proceedings in district court to have the Plan adjudged terminated as of August 15, 1976 and to have the PBGC appointed trustee. Harris and the PBGC, although agreeing that the Plan should be declared terminated, could not agree on a termination date.
 
 
 12
 PBGC, on September 22, 1980, filed an application (complaint) in the district court pursuant to 29 U.S.C. Secs. 1342(c) and 1348(3),[9] to have itself appointed trustee and to have the Plan decreed terminated as of August 15, 1976. PBGC also asked the district court to direct that all assets and records of the Plan be turned over to PBGC at its request. PBGC represented that once the Plan was deemed terminated, it would allocate Plan assets to participants in accordance with ERISA, 29 U.S.C. Sec. 1344, and would supplement the inadequate assets of the Plan with its own funds in order to provide statutorily guaranteed benefits to participants (see 29 U.S.C. Secs. 1322, 1361). Harris opposed the granting of any relief to the PBGC, arguing that the Plan completely terminated in April 1974, before the effective date of ERISA, and that even if no complete termination occurred in 1974 there was a partial termination in July 1972.
 
 
 13
 The district court, on cross-motions for summary judgment, fixed the complete termination date of the Plan at August 15, 1976, appointed the PBGC as statutory trustee, and ordered the assets and records to be transferred at the PBGC's request. These aspects of the district court's order are unchallenged on appeal. At issue is the district court's determination that most of the Plan had ended in July 1972, and that benefits under the terminated portions of the Plan were not insured by the PBGC. Under the district court's order, the benefits of all Harrison employees who did not transfer to Camden are uninsured. The finding by the district court of a "partial termination" in 1972 was based on Treasury Regulations and Revenue Rulings. A written opinion, and a subsequent "letter opinion" setting forth the effect of the partial termination, were filed, and a final order was entered by the district court on May 12, 1982.
 
 
 14
 PBGC's primary contention on appeal is that even if there had been a "partial termination" in 1972 in the sense employed by the Treasury Regulation and Revenue Rulings, this "partial termination" is irrelevant for present purposes, and the entire Plan remained subject to the ERISA insurance program when complete termination occurred in 1976. The Union, which was granted leave to file an amicus brief in support of the PBGC, agrees with the PBGC's argument, and urges the additional point that there was no partial termination even in the tax sense.[10] Harris maintains that the greater portion of the Plan terminated in the tax sense in 1972, and that this fact is controlling, so that the ERISA insurance program applies only to the part of the Plan that continued.
 
 II.
 
 15
 "[I]t is readily apparent that the major concern of Congress [in ERISA] was to ensure that bona fide employees with long years of employment and contributions realize anticipated pension benefits," Reuther v. Trustees of the Trucking Employees of Passaic and Bergen County Welfare Fund, 575 F.2d 1074, 1077 (3d Cir.1978).[11] In furtherance of this goal, Title IV of ERISA created an elaborate insurance system to guarantee that employees holding vested rights under qualified private pension plans would receive their expected benefits.[12] The PBGC was established by 29 U.S.C. Sec. 1302(a) in order to carry out the purposes of the plan termination insurance program. These purposes are specified by section 1302(a) as:
 
 
 16
 (1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants,
 
 
 17
 (2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which this title applies, and
 
 
 18
 (3) to maintain premiums established by the corporation [PBGC] under section 4006 [29 USCS Sec. 1306] at the lowest level consistent with carrying out its obligations under this title.
 
 
 19
 Subject to specified exceptions not claimed to be apposite here (29 U.S.C. Sec. 1321(b)), the PBGC insures any plan which "is, or has been determined by the Secretary of the Treasury to be, a plan described in section 401(a) of the Internal Revenue Code of 1954." 29 U.S.C. Sec. 1321(a)(2). Section 401(a) provides that a pension plan, and the trust forming part of the Plan, are "qualified" (that is, are eligible for certain tax advantages) only if several conditions are met, including that the plan be for the "exclusive benefit of ... employees or their beneficiaries" and that "the contributions or the benefits provided under the plan do not discriminate in favor of employees who are (A) officers, (B) shareholders, or (C) highly compensated."[13] See I.R.C. Secs. 401(a), 401(a)(4), 402, and 404. If a plan is "qualified" under section 401(a) then, subject to the conditions and limitations of 404, deductions from gross income are allowed to the employer on account of contributions made under the plan.
 
 
 20
 As noted above, however, no insurance is provided for plans which terminated before Title IV of ERISA went into effect. This means that participants who ended their employment before the 1974 effective date, but whose plans continued, will have their vested basic benefits insured up to certain limits, while participants in plans that ceased prior to this time are uninsured. For this reason, among others, the termination date is pivotal in ascertaining PBGC's duty to insure benefits. Cf. PBGC v. Heppenstall Co., 633 F.2d 293, 296 (3d Cir.1980).[14]
 
 
 21
 Section 1348(3) directs that the district court is to establish a termination date where, as in the present case, the plan administrator and the PBGC are unable to agree on a termination date. This provision offers no guidance for selecting a termination date, but the district court's discretion is not standardless. In a voluntary termination, the district court ordinarily cannot choose a date earlier than ten days after the filing of the Notice of Intent to Terminate.[15] Moreover, the purposes of the decree of termination, as set forth in section 1342(c), must be taken into account when choosing a date. See Heppenstall, 633 F.2d at 300. Section 1342(c) authorizes the PBGC to apply to the district court "for a decree adjudicating that the plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund." Heppenstall proposed a three part analysis for ascertaining the termination date: "[first] identify the interests of all of the plan participants and the PBGC, [second] establish the parameters which maximiz[e] those respective interests, and [third, within the limits of the statute] set the termination date accordingly." In re Braniff Airways, Inc., 24 B.R. 466, 472 (Bkrtcy.N.D.Tex.1982). It is true that Heppenstall involved an "involuntary termination" initiated by the PBGC under section 1342, while the present case implicates the somewhat different situation of a section 1341 "voluntary termination" brought by the plan administrator. See In re Syntex Fabrics, Inc. v. PBGC, 698 F.2d 199, 203-04 (3d Cir.1983). Heppenstall's requirement, however, that the termination date be set in accordance with the interests of the PBGC and plan participants seems appropriate whenever the district court is required to exercise its section 1348(3) power to choose a termination date, although the analysis may have to be applied differently in a "voluntary" case.[16]
 
 
 22
 Proper deference to the PBGC's choice of a termination date must be given. In Heppenstall we accorded the PBGC's suggested termination date merely "fair consideration." 633 F.2d at 301. There, however, the Court was influenced by the fact that the PBGC was attempting to limit its liability by the selection of a relatively early termination date. The Heppenstall court also took into account that the date there advocated by PBGC did not appear to be based on any interpretation of ERISA. Where the PBGC is interpreting Title IV of ERISA, and especially where the special facts of Heppenstall are not present, the views of the agency are due greater deference than the court accorded in Heppenstall.[17]
 
 III.
 
 23
 The district court, reasoning from Heppenstall and the statutory framework, fixed the termination date at August 15, 1976. It took into account, among other things, "the fact that the employees' collective bargaining agreement was to expire on August 15, 1976 (only 3 days after the earliest possible termination date which could be set [because of the section 1341(a) ten day notice provision] and the competing interests of the parties involved..." No challenge is taken in this appeal to that determination.
 
 
 24
 Sections 1342(c) and 1348(3), and their interpretation in Heppenstall, would if applicable preclude the fixing of a termination date in 1972. We do not understand Harris to be arguing otherwise; rather Harris' point appears to be that Heppenstall and the two statutory provisions are irrelevant because the Plan in fact largely ceased to exist before ERISA went into effect. Harris proposes that because the only legal principles governing plan terminations that existed in 1972 were tax principles, tax rulings and regulations must be employed to determine whether a partial termination occurred in 1972. It reasons that ERISA cannot be construed to resurrect a dead plan. If under the only available legal precepts the Plan was for the most part defunct in July of 1972, then according to Harris ERISA cannot be said to have reinstated it retroactively.
 
 
 25
 For the claim that there was a "partial termination" in 1972, Harris relies on Treas.Reg. Sec. 1.401-6(b)(2) (1963) and on several revenue rulings. The regulation states generally that "[w]hether or not a partial termination of a qualified plan occurs when a group of employees who have been covered by the plan are subsequently excluded from such coverage either by reason of an amendment to the plan, or by reason of being discharged by the employer, will be determined on the basis of all the facts and circumstances."[18] This regulation was applied to particular fact situations in various revenue rulings. See Rev.Rul. 72-439, 1972-2 C.B. 223, Rev.Rul. 72-510, 1972-2 C.B. 223, Rev.Rul. 73-284, 1973-2 C.B. 139, and Rev.Rul. 81-27, 1981-1 C.B. 228 (superseding Rev.Rul. 72-510). In one instance, the IRS advised that a "partial termination" of a qualified pension plan had occurred when twelve of fifteen participating employees were discharged after they declined to transfer to the employer's new business location at the time the original location was closed. Rev.Rul. 73-284. Cf. Wishner v. St. Luke's Hospital Center, 550 F.Supp. 1016 (S.D.N.Y.1982) (discharge of 3.7% of employees not a "significant percentage" causing partial termination under the relevant revenue rulings).
 
 
 26
 Harris' view of the effect of what in tax terms might be a "partial termination," though not without abstract appeal, cannot be accepted. The essence of Harris' error is that Harris treats the question whether part of its plan stopped as if it were a question of tax law, rather than as a question of contract interpretation. There is no suggestion that the terms of the Plan called for the Plan to end under circumstances such as arose in 1972, and in no practical sense did the Plan then cease to operate. Harris' position is founded, not upon the explicit or implicit provisions of the Plan, but solely upon tax principles. These tax principles, however, do not speak, and do not purport to speak, to the question whether such events cut short the life of plans. To understand the supposed "partial termination" for tax purposes as having caused a segment of the Plan to go out of existence, even when the Plan's terms do not so provide, is to fall "victim to the not uncommon error of reading technical pension language as if it were ordinary English speech," see Riley v. MEBA Pension Trust, 570 F.2d 406, 408-9 (2d Cir.1977).[19]
 
 
 27
 The tax rulings and regulations surrounding terminations serve a limited purpose. They appear in the context of a statutory and regulatory scheme which, recognizing the dangers that employer manipulation of pension benefits may create, conditions tax benefits (in particular, deductibility of employer contributions) upon compliance with rules designed to benefit employees. Under I.R.C. Sec. 401(a)(7) and accompanying regulations (Treas.Reg. Sec. 1.401-6(a)(1) (1963)), there must be a full vesting of accrued benefits, to the extent funded, on the termination of the plan.[20] Because a "termination" can be either a complete or partial termination, if the plan meets the statutory standard then the benefits of participants in a "partially terminated" portion of a plan would vest upon "partial termination" (see Treas.Reg. Sec. 1.401-6(b)(2) (1963)). A second effect of a partial or complete termination of a plan which satisfies the strictures of the "qualification" provisions of section 401(a) is that this event forces any previously unallocated funds to be allocated to the employees covered by the plan. Treas.Reg. Sec. 1.401-6(a)(2) (1963).[21] A partial or complete termination in the tax sense is significant for a third reason: such termination of a "plan intended to meet the requirements of section 401(a) of the Code may affect the qualification of the plan." Rev.Rul. 69-24, 1969-1 C.B. 110-111. If the plan is terminated without a valid business reason, this may indicate that the plan from its inception was not "a bona fide program for the exclusive benefit of employees in general," and that it should be retroactively disqualified. Id.; see also Rev.Rul. 69-25, 1969-1 C.B. 113. Disqualification, of course, can have very serious tax consequences.[22]
 
 
 28
 Rules governing the effect of a "partial termination" in the tax sense serve the purpose of helping to ensure that employees will not be deprived of their anticipated benefits. These rules also deter employers from arbitrarily cutting groups of workers out of existing pension plans. It would seem that the employer could realize a windfall if it could, through the discharge of a substantial portion of plan participants, cause a larger number of employees to forfeit their pension benefits than would be anticipated under actuarial formulas. See Lucas v. Seagrave, 277 F.Supp. 338, 345 (D.Minn.1967); Fleck v. Spannaus, 449 F.Supp. 644, 648 n. 3 (D.Minn.1977).[23]
 
 
 29
 Tax precepts governing "partial terminations" are intelligible in the context of the limited purposes that they are meant to serve. But there is no reason to read them as stating that, when a "partial termination" takes place for tax purposes, then a segment of the plan in fact necessarily is broken off and goes out of existence for purposes of plan termination insurance. Harris has not provided any explanation of why Congress would have chosen to let the PBGC's power in cases such as the present one hinge on the factors relating to "partial terminations" enumerated in the Treasury Regulations and applied in the Revenue Rulings; indeed such an interpretation would appear to be a rebuke to the intent manifest in ERISA. Under Harris' analysis, if an employer in 1972 discharged a sufficiently large number of employees at one time, or amended its plan to exclude a great many participants, or precipitously lowered contributions or benefits, then the very tax rules designed to keep employees from being deprived of benefits would be turned against the employees to preclude insurance of their benefits.[24]
 
 
 30
 The question whether under the terms of the Plan agreement there was a partial termination in 1972 is essentially one of contract interpretation; i.e., whether the terms of the Plan call for it to end under circumstances such as those that occurred in 1972. In Van Orman v. American Insurance Co., 680 F.2d 301, 308-09 (3d Cir.1982), this Court declined to import a revenue ruling into the interpretation of a pension plan. Underlying this aspect of Van Orman is the proposition that in most instances tax principles do not control the interpretation of the terms of a pension plan. Indeed, Harris appears not even to claim that tax law bears on the interpretation of the plan agreement; it seems simply to ignore that fact that the contract, not the tax code, is the primary document in ascertaining whether under the facts of this case part of the Plan was extinguished.[25]
 
 
 31
 Our conclusion that all of the Plan is insurable by PBGC is supported by 29 U.S.C. Sec. 1321(a)(2). Section 1321(a)(2) is explicit that insurance coverage is provided not merely for plans that are tax-qualified, but also for plans that have been determined by the Secretary of the Treasury to be tax-qualified. There is no allegation that the IRS in the present case ever rescinded its determination that Harris' plan was qualified. The IRS determination of course encompassed all of the Plan. It would appear to strain the language of section 1321(a)(2) to hold that by virtue of an alleged pre-ERISA "partial termination" for tax purposes, a plan is largely uninsured, despite an IRS determination that the plan is qualified. This is especially so when the plan by its terms has never been partitioned and has continued to operate without interruption.[26]
 
 
 32
 Legislative history buttresses our reading of section 1321(a)(2). The House Conference Report on ERISA, discussing the coverage of plan termination insurance provided by ERISA, notes that "[a] plan once determined to be a qualified plan by the Internal Revenue Service is a covered plan even if the determination is subsequently deemed erroneous." H.R.Rep. No. 93-1280, 93d Cong., 2d Sess. 367 (1974), reprinted in 1974 U.S.Code Cong. & Ad.News 5038, 5146. This suggests, as does the express language of section 1321(a)(2), that an IRS determination that a plan is tax-qualified is dispositive for purposes of PBGC insurance. If a plan would be covered even if the pre-ERISA IRS qualification determination had never been correct, then surely a plan would be covered when the initially accurate and never revoked pre-ERISA determination becomes in some sense outdated because of a subsequent "partial termination."[27]
 
 
 33
 ERISA recognizes that a "partial termination" within the meaning of the tax code is not a termination for ERISA purposes. Under 29 U.S.C. Sec. 1343(b)(4), the plan administrator is required to notify the PBGC "when the Secretary of the Treasury determines that there has been a termination or partial termination of the plan within the meaning of section 411(d)(3) of the Internal Revenue Code of 1954...." But, despite this classification of tax "terminations" and "partial terminations" as "reportable events," section 1343(b)(4) is careful to specify that "the occurrence of such a termination or partial termination does not, by itself, constitute or require a termination of a plan under [the plan termination insurance provisions of ERISA]." Section 1343(b)(4), like the rest of ERISA, was not in effect in 1972, when the "partial termination" of Harris' plan is alleged to have taken place. But this statutory provision informs our analysis of the present case in that it evinces a legislative realization that a "partial termination" in technical tax terms does not necessarily result in a plan's partial extinction, and that a finding by the IRS that a plan has "partially terminated" is meant to serve purposes different from a determination that a plan is or should be terminated under the ERISA insurance scheme. If a post-ERISA "partial termination" in the tax sense would not necessarily occasion a termination for ERISA purposes, then neither should a "partial termination" that may have occurred before ERISA was enacted.[28]IV.
 
 
 34
 Whether or not a "partial termination" in tax terms took place in 1972, no portion of the Plan terminated for purposes of PBGC insurance until August 15, 1976. The PBGC has the power to guarantee the benefits of employees terminated before Harris' move to Camden, subject of course to the conditions and limitations of 29 U.S.C. Sec. 1322.
 
 
 35
 Accordingly, the district court's order will be vacated insofar as it adjudges the Plan terminated in part in July 1972 and holds that benefits of employees of the terminated part are not insurable by PBGC.
 
 
 
 *
 Judge Garth took part in oral argument but because of illness was unable to participate in the disposition of this appeal
 
 
 [1]
 The Plan is a "single-employer" plan. "Multi-employer" plans, as defined by 29 U.S.C. Sec. 1301(a)(3), are subject to special termination insurance provisions not applicable here
 
 
 [2]
 The PBGC's authority to guarantee benefits under the Plan is predicated here on the fact that (subject to certain exceptions) ERISA requires it to insure any plan which "is, or has been determined by the Secretary of the Treasury to be, a plan described in section 401(a) of the Internal Revenue Code of 1954," 29 U.S.C. Sec. 1321(a)(2)
 
 
 [3]
 The precise number of Harris Union employees as of January 1972 does not appear of record. Prior to 1971, there were between 100 and 200 Union employees of Harris at any one time, all of whom worked at the Harrison plant. Only fifty-five Union employees were working for Harris in Harrison in July 1971. The number of Union employees at the Camden plant has fluctuated between five and twenty
 
 
 [4]
 Harris charges that there is no basis in the record for the Union's statement in its brief "that current Harris Pension Fund contributions were being used in 1973 and 1974 to provide benefits to former Harrison employees...." But Harris' own statement of facts to the PBGC (contained in Exhibit (16) in the district court) notes that the Camden employees "realized that any contributions made on their behalf into the Fund were immediately being paid out of the Fund to purchase benefits for former employees at Harrison...." At least one eligible participant has not received the benefits to which he is entitled under the Plan; it is not clear at what time this individual applied or became eligible for benefits
 
 
 [5]
 Harris periodically drew checks representing contributions to the Plan, but these checks were not cashed. Harris apparently could not establish a formal escrow account because it lacked any written escrow agreement signed by the Union. The Company did, however, continue to claim federal tax deductions for contributions to the Plan through December 31, 1977. In 1979, an amount equal to the face amount of the checks was deposited in bank accounts in the name of escrow agents of Harris
 Harris argued below that following the April 1974 request by the Union there was a complete discontinuance of contributions, which constituted a complete termination of the Plan. Had the Plan terminated at that time, rather than in 1976, the PBGC would have been unable to insure the benefits promised by the Plan. The district court rejected this contention, holding that in 1974 Harris and the Union, because of the problem of the fund's depletion, had simply made "other mutually satisfactory arrangements" for establishing a pension fund, as expressly permitted by the Plan. Harris has not appealed from the district court's determination that there was no termination in 1974, and this issue therefore is not before us.
 
 
 [6]
 Under some conditions, insurance can be provided for plans terminated July 1-September 1, 1974. See 29 U.S.C. Sec. 1461(b). The special issues raised by insurance for plans terminated during the so-called "window period" after June 30, 1974 and before September 2, 1974, are not present in this case. Cf. Belland v. PBGC, 2 Empl.Ben.Cas. (BNA) 1531 (D.D.C.1981) (discussing "window period" coverage)
 
 
 [7]
 The question whether benefits of the Harrison employees were "vested," or to use the synonymous term, "nonforfeitable" (see Nachman, 446 U.S. at 376, 100 S.Ct. at 1733) has not been presented to this Court. It appears that Harris acknowledges that, prior to separation from employment, a substantial proportion of the Harrison employees who did not transfer to Camden had vested benefits. If some rights became vested solely because of a partial termination, these rights would not be guaranteed by the PBGC. See 29 U.S.C. Sec. 1322(a)
 The provision for the employer's liability to PBGC, to reimburse it for certain amounts paid under terminated plans (see 29 U.S.C. Sec. 1362; 29 C.F.R. Sec. 2622), was phased in slowly, beginning with September 2, 1974. Nachman, 446 U.S. at 382-84, 100 S.Ct. at 1736-1737, details the four stage scheme carefully created by Title IV of ERISA, under which Title IV's impact on employers became increasingly severe until the final period beginning on January 1, 1976. Cf. A-T-O, Inc. v. PBGC, 634 F.2d 1013, 1019-23 (6th Cir.1980) (discussing employer liability with particular reference to the first 270 days after September 2, 1974).
 
 
 [8]
 Section 1341 deals with so-called voluntary terminations. This section provides that if the plan administrator decides on termination, it shall notify the PBGC at least ten days in advance, and for 90 days shall make no payments pursuant to the plan's termination procedures. Section 1341(a). If, within this 90 day period, the PBGC cannot determine that the Plan's assets, if allocated in accordance with section 1344, are sufficient to discharge the plan's obligations with respect to basic benefits (see section 1301(a)(6)) it is to notify the Plan administrator of this and shall commence an action under section 1342 to have the plan terminated. Section 1341(b) and (c). In In re Syntex Fabrics, Inc. Pension Plan, 698 F.2d 199, 203 n. 7 (3d Cir.1983), we rejected the view that a section 1341 voluntary termination "may only occur when the plan assets are sufficient to pay all liabilities of the plan."
 
 
 [9]
 According to 29 U.S.C. Sec. 1342(c):
 If the corporation [PBGC] has issued a notice under this section to a plan administrator and (whether or not a trustee has been appointed under subsection (b)) has determined that the plan should be terminated, it may, upon notice to the plan administrator, apply to the appropriate United States district court for a decree adjudicating that the plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund.
 Section 1342(c) also provides that the court shall appoint a trustee, if one has not already been appointed, to carry out the plan's termination once it has been decreed that the plan is to be terminated. It is specified by Sec. 1348(3) that where the plan administrator and the PBGC are unable to agree on a termination date, the date is established by the court.
 
 
 [10]
 The Union and its Local had commenced suit against Harris on January 8, 1980, alleging wrongful acts in connection with the Plan. The complaint filed by the Union was later consolidated with that of the PBGC. Because the Union and Harris settled their dispute out of court, the district court addressed only the issues that existed between the PBGC and Harris
 
 
 [11]
 Cf. Nachman, supra, 446 U.S. at 374, 100 S.Ct. at 1732: "One of Congress' central purposes in enacting this complex legislation was to prevent the 'great personal tragedy' suffered by employees whose vested benefits are not paid when pension plans are terminated." (footnotes omitted). See also Allesi v. Raybestos--Manhattan, Inc., 451 U.S. 504, 510, 101 S.Ct. 1895, 1899, 68 L.Ed.2d 402 (1981)
 
 
 [12]
 This Court has reviewed on two recent occasions the pension plan termination insurance program created by Title IV of ERISA: Syntex Fabrics, supra n. 8, 698 F.2d at 200-01; PBGC v. Heppenstall Co., 633 F.2d 293, 295-97 (3d Cir.1980). See also Murphy v. Heppenstall Co., 635 F.2d 233, 237-38 (3d Cir.1980)
 
 
 [13]
 For a summary of the qualification rules prescribed by section 401(a) and related statutory provisions and regulations, see Bittker, 2 Federal Taxation of Income, Estates and Gifts p 61.2 (1981 and Supp.1982)
 
 
 [14]
 No one has argued to us that even if a portion of the Plan had split off and terminated before Title IV of ERISA became effective, this portion of the Plan would be insurable on the ground that the remainder of the Plan persisted. Cf. Adams v. Gould, Inc., 2 Empl.Ben.Cas. 1874 (E.D.Pa.1981), rev'd in part, on other grounds, 687 F.2d 27 (3d Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1777, 75 L.Ed.2d ----, 51 U.S.L.W. 3752 (1983) (rejecting such an argument). Accordingly, this question will not be discussed
 
 
 [15]
 29 U.S.C. Sec. 1341(a) states that the plan administrator's proposed termination date "may not be earlier than 10 days after the filing of the notice" that the plan is to be terminated. The PBGC appears to have taken the position in Braniff Airways, supra, 24 B.R. at 470, that in "exceptional circumstances" an earlier termination date will be proper. See also, In re Pension Plan for Employees of Broadway Maintenance Corp., 547 F.Supp. 629, 632 (S.D.N.Y.1982)
 
 
 [16]
 In considering the interests of participants, the date on which they first received notice that the plan is to be terminated is significant, and often will be the earliest possible termination date. In Heppenstall, 633 F.2d at 302, we concluded "that the earliest date which could properly be selected by the court is that date on which participant employees had some reasonable notice that PBGC was seeking termination, and thus that they no longer had a justifiable expectation in the accrual of vested pension rights." In a case such as the present one, in which termination first is sought by the plan administrator, Heppenstall might normally require that no date prior to the administrator's reasonable notification to participants that it was seeking termination could be chosen by the court. In this case, however, it appears that none of the participants at issue could have expected to accrue further benefits after July 1972, despite the lack of any notification until 1976. It is unclear that no date prior to notification could be chosen as a partial termination date in such a case. Yet Harris' failure to provide any notice until 1976 is significant if for no other reason than because it tends to show that the Plan in fact persisted up to 1976. Cases which have dealt with the problem of notice to plan participants as affecting the possible range of termination dates are Broadway Maintenance, supra n. 15, 547 F.Supp. at 632-33; PBGC v. Dickens, 535 F.Supp. 922, 925-26 (W.D.Mich.1982) (disapproved in part, Syntex, supra, 698 F.2d at 203 n. 7); and Braniff Airways, supra, 24 B.R. at 471-74
 
 
 [17]
 See Connolly v. PBGC, 581 F.2d 729, 730 (9th Cir.1978), cert. denied, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979) ("the determination of the PBGC ... is entitled to great deference in the construction and application of ERISA."); Concord Control, Inc. v. International Union, UAW, 647 F.2d 701, 704 (6th Cir.) cert. denied, 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981) (PBGC construction of exemption from insurance coverage found in 29 U.S.C. Sec. 1321(b)(5) entitled to "great deference.") Cf. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969) (the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.")
 
 
 [18]
 This regulation goes on to state:
 Similarly, whether or not a partial termination occurs when benefits or employer contributions are reduced, or the eligibility or vesting requirements under the plan are made less liberal, will be determined on the basis of all the facts and circumstances.
 Treas.Reg. Sec. 1.411(d)-2(b)(1) (1977), the post-ERISA counterpart to Sec. 1.401-6, contains similar language:
 Whether or not a partial termination of a qualified plan occurs (and the time of such event) shall be determined by the Commissioner with regard to all the facts and circumstances in a particular case. Such facts and circumstances include: the exclusion, by reason of a plan amendment or severance by the employer, of a group of employees who have previously been covered by the plan; and plan amendments which adversely affect the rights of employees to vest in benefits under the plan.
 Harris' argument appears to be based upon an understanding of the tax law as it existed in 1972, when the alleged "partial termination" occurred.
 
 
 [19]
 It should be apparent that in refusing to hold that Harris' plan in fact largely ceased in 1972, we intimate no view as to whether a "partial termination" under the Treas.Reg. took place, and do not mean to cast any doubt on the validity of the regulations or revenue rulings relied upon by Harris
 
 
 [20]
 Prior to ERISA, I.R.C. Sec. 401(a)(7) provided:
 A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that, upon its termination or upon complete discontinuance of contributions under the plan, the rights of all employees to benefits accrued to the date of such termination or discontinuance, to the extent then funded, or the amounts credited to the employees' accounts are nonforfeitable. This paragraph shall not apply to benefits or contributions which, under provisions of the plan adopted pursuant to regulations prescribed by the Secretary or his delegate to preclude the discrimination prohibited by paragraph (4), may not be used for designated employees in the event of early termination of the plan.
 Section 401(a)(7) now reads:
 A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part satisfies the requirements of section 411 (relating to minimum vesting standards).
 See also Treas.Reg. Sec. 1.411(d)-2(a)(1) (1977).
 
 
 [21]
 Treas.Reg. Sec. 1.411(d)-2(a)(2) (1977) is similar
 
 
 [22]
 Cf. Craig v. Bemis Co., 517 F.2d 677, 686 (5th Cir.1977) (quoting an earlier case to the effect that, in the absence of an indication within the plan agreement "to use the provisions of the Internal Revenue Code to interpret or define" its terms, "it would appear that the only consequence ... of the 'partial termination' of a plan with the employer denying accrued benefits would be a failure to qualify under the provisions so as to render improper an income tax deduction by the employer for its contributions")
 
 
 [23]
 According to Lucas, the actuarial formula under which an employer's pension plan contributions are determined may make assumptions which do not
 cover the occurrence of a group termination. The actuarial formula assumes a reasonable turnover rate for employees established by experience with individual separations over a period of time. Where there is a termination of a substantial number of the plan participants, it seems clear that such a turnover is not anticipated by the formula. The result is that an employer who has discharged a relatively large number of employees receives a windfall, palpably in excess of actuarial assumptions, in the form of pension credit forfeitures which he can use to relieve for some time his future premium liability for the remaining employees.
 
 
 [277]
 F.Supp. at 345, footnote omitted
 
 
 [24]
 Not all "partial terminations" in tax terms involve the exclusion of some group of employees from a plan. Under Treas.Reg. Sec. 1.401-6(b)(2) (1963), a mere reduction in benefits or employer contributions can, in some circumstances, constitute a "partial termination."
 
 
 [25]
 Other courts that have considered the question appear to agree that tax provisions normally do not bear on contract interpretation. See Craig, supra, 517 F.2d at 686; Langer v. Iowa Beef Packers, Inc., 420 F.2d 365, 369-70 (8th Cir.1970); Shaw v. Kruidenier, 470 F.Supp. 1375, 1385 (S.D.Iowa 1979); Hardy v. H.K. Porter Co., 417 F.Supp. 1175, 1183 (E.D.Pa.1978); Lovetri v. Vickers, Inc., 397 F.Supp. 293, 300 (D.Conn.1975); Rothlein v. Armour and Co., 377 F.Supp. 506, 512 (W.D.Pa.1974). Cf. Blackmar v. Lichtenstein, 603 F.2d 1306, 1309 (8th Cir.1979); Flinchbaugh v. Chicago Pneumatic Tool Co., 531 F.Supp. 110, 113 (W.D.Pa.1982). See also Rev.Rul. 70-315, 1970-1 C.B. 91 ("An employee's rights under a trusteed pension, profit-sharing, or stock bonus plan are governed by the terms of the plan and trust agreement and the applicable provisions of local law. The jurisdiction of the Service with respect to such a plan is limited to determinations regarding (1) whether the plan meets the applicable requirements of the Code and regulations, (2) whether amounts claimed as deductions from gross income for contributions to the plan are allowable, and (3) the tax effect of distributions under such plans.")
 
 
 [26]
 We need not decide here whether, when circumstances indicate that a pension plan in fact had largely terminated before ERISA, an unrevoked IRS determination letter in itself would require the conclusion that the entire plan is covered by PBGC insurance
 
 
 [27]
 To similar effect is In re Williamsport Milk Products Co., 206 Pens.Rep. (BNA) D-15 (M.D.Pa., Sept. 18, 1978), aff'd, 631 F.2d 726 (3d Cir.1980). Williamsport in 1960 and 1963 received favorable determination letters concerning its pension plan from the IRS. In 1966, Williamsport substantially amended its plan and sought redetermination of the plan's tax qualification. The IRS, however, issued no determination letter in response. The district court, although noting that on its face the 1966 amended plan failed to satisfy the tax code requirements, held that despite the changes the amended plan was a continuation of the same plan, and that the outstanding determination of qualification meant that the plan was covered by Title IV of ERISA when it terminated on August 3, 1975
 
 
 [28]
 Our understanding of section 1343(b)(4) is consistent with the PBGC's Guidelines on Voluntary Termination, Pub. No. PBGC 503 (1977) which state that "it is important to note that circumstances or events which result in the partial termination of a covered plan for purposes of the Internal Revenue Service (IRS) may not be events for which voluntary termination of the plan under Title IV is appropriate." Treas.Reg. Sec. 1.411(d)-2(c)(2) (1977) states that a plan is terminated for tax purposes when terminated under ERISA; it does not imply that a tax "complete termination"--still less a "partial termination"--does or should result in an ERISA termination