TIPTON & KALMBACH, INC., PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 21088–81R.     Filed July 25, 1984.

*James H. Turner* and *Stephen A. Weinstein,* for the petitioner.

*Samuel E. Berger,* for the respondent.

### OPINION

PANUTHOS, *Special Trial Judge*: Petitioner has instituted this action pursuant to section 7476(a)(2)(B)[1] for a declaratory judgment that the Tipton & Kalmbach, Inc. Profit Sharing Retirement Plan has been, and continues to be, a qualified plan under section 401(a). This case was assigned pursuant to the provisions of section 7456(d) and Rule 218(a).

This case was submitted for decision on a stipulated administrative record under Rule 122. The stipulated record is incorporated herein by this reference.

Petitioner Tipton & Kalmbach, Inc., is a corporation with its principal office located in Denver, CO. The Tipton & Kalmbach, Inc. Profit Sharing Retirement Plan (hereinafter the

---

[1] All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise indicated, and all Rule references are to the Tax Court Rules of Practice and Procedure.

plan) was put into effect on April 30, 1958, and was amended on April 30, 1959, and June 20, 1975. Petitioner received a favorable determination letter with respect to the plan on or about August 26, 1959. On July 25, 1979, petitioner adopted the Tipton & Kalmbach, Inc. Restated Profit Sharing Plan (hereinafter sometimes also the plan) to be effective April 30, 1976. Said plan was amended on October 31, 1979, and again in 1981.

On July 25, 1979, the petitioner submitted an application for Determination for a Defined Contribution Plan (Form 5301) with the District Director of Internal Revenue at Denver, CO, requesting a determination that the plan met the requirements of section 401(a). The District Director, Denver, CO, sent the petitioner a proposed adverse determination letter dated July 16, 1981. Petitioner filed a petition for declaratory judgment with this Court on August 11, 1981. Respondent filed a motion to dismiss for lack of jurisdiction on the ground that petitioner failed to exhaust administrative remedies as required by section 7476(b)(3) and Rule 210(c)(4), which motion was denied.[2] The sole issue presented is whether there were partial terminations of the plan in 1971 and 1972. The parties agree that if a partial termination occurred, the plan is not qualified under section 401(a) because of petitioner's failure to grant nonforfeitable rights to benefits to discharged participants.

Since 1954, petitioner has been in the business of providing consulting services with respect to the engineering of large projects for the development and use of water resources on a worldwide basis. The consulting engineering industry is inherently volatile. Petitioner and other similarly situated companies do not have sufficient control over available work to insure that force levels will remain constant. In 1971 and 1972, petitioner experienced reductions in work force. The reductions in force were not due to a liquidation of petitioner or any of its divisions but simply to the inherent volatility of the consulting engineering business. Petitioner was unable to prevent the reductions in force which were due to the decreased volume of its business. The reductions in work force

---

[2]See *Tipton & Kalmbach, Inc. v. Commissioner*, T.C. Memo. 1982–260.

resulted in reductions in plan participation for the plan years ended April 30, 1971, and April 30, 1972, as follows:

|                              | 1971 | 1972 |
|------------------------------|------|------|
| Beginning of year            | 64   | 43   |
| Added during year            | 1    | 0    |
| Dropped during year          | 22   | 22   |
| Reduction in participation   | 34%  | 51%  |

The number of plan participants as of the end of each of the plan years 1966 through 1977 was as follows:

| Year | Participants |
|------|--------------|
| 1966 | 96 |
| 1967 | 88 |
| 1968 | 82 |
| 1969 | 75 |
| 1970 | 64 |
| 1971 | 43 |
| 1972 | 21 |
| 1973 | 15 |
| 1974 | 17 |
| 1975 | 20 |
| 1976 | 23 |
| 1977 | 16 |

The pertinent parts of the Tipton & Kalmbach, Inc. Restated Profit Sharing Retirement Plan provide:

*Partial Termination*: Upon termination of the plan with respect to a group of Participants which constitutes a partial termination of the Plan, the Trustees shall allocate and segregate for the benefit of the Employees then or theretofore employed by the Employer with respect to which the Plan is being terminated the proportionate interest of such Participants in the Trust Fund. The funds so allocated and segregated shall be used by the Trustees to pay benefits to or on behalf of Participants in accordance with section 14.3. * * *

*Liquidation of the Trust Fund*: Upon termination of the Plan, or partial termination, the accounts of all Participants affected thereby shall become fully vested, and the Trustees shall distribute the assets remaining in the Trust Fund, after payment of any expenses properly chargeable thereto, to Participants, Former Participants and Beneficiaries in proportion to their respective account balances. * * *

*Forfeitures*: As of the end of each year, Forfeitures which have become available for distribution during such year shall be credited to the Employer Contribution Accounts of the same Participants who are entitled to share in

the Employer's contribution for the year, and such amounts shall be allocated according to subsection (b) above. * * *

At the outset, it is appropriate to deal with a procedural issue raised by petitioner. Petitioner cites Rule 217(c)(1)(ii), which provides in relevant part that if respondent has not issued a notice of determination he shall bear the burden of proof as to every ground upon which he relies to sustain his position. Petitioner argues that because a notice of determination was not issued by the respondent in this case, the respondent must bear the burden of proof as to the issue of whether there were partial terminations of the plan. Respondent acknowledges that he bears the burden of proof, but contends that the burden of proof plays an insignificant role in this case which is fully stipulated on the administrative record.

We agree with respondent on this issue. The facts are agreed to in this case. As we stated in *BBS Associates, Inc. v. Commissioner*, 74 T.C. 1118, 1121 (1980), affd. 661 F.2d 913 (3d Cir. 1981), it is an "incorrect assumption that the burden of proof affects the weight to be accorded a party's legal arguments."

Prior to its amendment by the Employee Retirement Income Security Act of 1974 (Pub. L. 93–406, 88 Stat. 829 (hereinafter ERISA)), section 401(a)(7) provided in part:

(7) A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that, upon its termination or upon complete discontinuance of contributions under the plan, the rights of all employees to benefits accrued to the date of such termination or discontinuance, to the extent then funded, or the amounts credited to the employees' accounts are nonforfeitable. * * *

The regulations made clear that the term "termination" as used in section 401(a)(7) included a partial termination as well as a complete termination of a plan:

(b) Termination defined. * * *
(2) For purposes of this section, the term "termination" includes both a partial termination and a complete termination of a plan. Whether or not a partial termination of a qualified plan occurs when a group of employees who have been covered by the plan are subsequently excluded from such coverage either by reason of an amendment to the plan, or by reason of being discharged by the employer, will be determined on the basis of all the facts and circumstances. Similarly, whether or not a partial termination occurs

when benefits or employer contributions are reduced, or the eligibility or vesting requirements under the plan are made less liberal, will be determined on the basis of all the facts and circumstances. However, if a partial termination of a qualified plan occurs, the provisions of section 401(a)(7) and this section apply only to the part of the plan that is terminated. [Sec. 1.401–6(b)(2), Income Tax Regs.]

With the enactment of ERISA, section 401(a)(7) was amended to require that a plan satisfy the minimum vesting standards of section 411:

A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part satisfies the requirements of section 411 (relating to minimum vesting standards).

Section 411(d)(3) provides:

(3) TERMINATION OR PARTIAL TERMINATION: DISCONTINUANCE OF CONTRIBUTIONS.—Notwithstanding the provisions of subsection (a), a trust shall not constitute a qualified trust under section 401(a) unless the plan of which such trust is a part provides that—

(A) upon its termination or partial termination, or

(B) in the case of a plan to which section 412 does not apply, upon complete discontinuance of contributions under the plan,

the rights of all affected employees to benefits accrued to the date of such termination, partial termination, or discontinuance, to the extent funded as of such date, or the amounts credited to the employees' accounts, are nonforfeitable. This paragraph shall not apply to benefits or contributions which, under provisions of the plan adopted pursuant to regulations prescribed by the Secretary to preclude the discrimination prohibited by section 401(a)(4), may not be used for designated employees in the event of early termination of the plan.

There is no dispute that the Tipton & Kalmbach, Inc. Restated Profit Sharing Plan contains the language required by sections 401(a)(7) and 411(d)(3). The sole issue is whether partial terminations of the plan occurred as a result of the reductions in force in 1971 and 1972.

The parties appear to disagree as to whether pre-ERISA or ERISA law governs resolution of this issue. We are of the view that the applicable law is that which existed in 1971 and 1972, the years in which the alleged partial terminations occurred. ERISA sec. 1017(b), 88 Stat. 932.[3]

---

[3]We note, however, that Congress in enacting ERISA appears to have adopted the facts and circumstances test of sec. 1.401–6(b)(2), Income Tax Regs., for determining whether a partial termination has occurred. H. Rept. 93–807 (1974), 1974–3 C.B. (Supp.) 236, 300; S. Rept. 93–383 (1973), 1974–3 C.B. (Supp.) 80, 129.

Petitioner argues that respondent in his proposed adverse determination letter failed to consider the facts and circumstances of petitioner's case, as required by the regulations. Petitioner contends that an examination of all the facts and circumstances demonstrates that no partial termination occurred. To support its position, petitioner points to the fact that the reductions in work force, and concomitant reductions in plan participation, were due to a reduction in the volume of petitioner's business, a circumstance over which the petitioner had no control. Petitioner emphasizes that there was no intent or purpose to deprive employees of benefits to which they would have been entitled had they remained in petitioner's employ. Respondent maintains that an examination of all the facts and circumstances compels the conclusion that partial terminations occurred. Respondent contends that adverse economic conditions "will not excuse what is otherwise a partial termination."[4]

The issue is one of first impression in this Court. Although other courts have considered the question of what constitutes a partial termination, these cases have arisen where a former employee (usually in a class action) has brought an action against a former employer or plan administrator alleging wrongful deprivation of retirement benefits by virtue of a partial termination. The cases generally have held the Federal income tax law relevant only to the tax status of the plan and not to the right of recovery of a discharged plan member. See, e.g., *United Steelworkers of America v. Harris & Sons Steel Co.*, 706 F.2d 1289, 1299 (3d Cir. 1983), and cases cited therein. The few cases that have considered Federal income tax law controlling have adopted the "significant percentage" test of respondent's revenue rulings (see note 4); thus, in determining whether a partial termination occurred, those cases have

---

[4]Both parties have devoted considerable attention on brief to a discussion of three revenue rulings: Rev. Rul. 72–439, 1972–2 C.B. 223 (partial termination occurred when a union contract caused 120 of the plan's 170 participants to become ineligible to participate in the plan); Rev. Rul. 73–284, 1973–2 C.B. 139 (partial termination occurred when 12 out of 15 plan participants were discharged after they decided not to transfer to the employer's new location approximately 100 miles from the original location); and Rev. Rul. 81–27, 1981–1 C.B. 228, superseding Rev. Rul. 72–510, 1972–2 C.B. 223 (partial termination occurred when 95 out of 165 plan participants were discharged when employer closed down a division of its business; ruling applied irrespective of whether decrease in plan participation was the result of adverse economic conditions). Although we have considered the parties' arguments with respect to the rulings in our disposition of this case, we find a detailed discussion of those arguments unnecessary.

looked to whether a significant percentage of plan participants were excluded from coverage. See *Ehm v. Phillips Petroleum Co.*, 583 F. Supp. 1113 (D. Kan. 1984); *Wishner v. St. Luke's Hospital Center*, 550 F. Supp. 1016 (S.D.N.Y. 1982); *Beck v. Shaw Industries, Inc.*, No. C81–72A (N.D. Ga., Dec. 29, 1981).

After a careful consideration of the parties' arguments, we agree with the respondent that under all of the facts and circumstances of this case, partial terminations of the plan occurred in 1971 and 1972. A significant percentage of plan participants were discharged in each of those years.[5] The fact that the discharges were due to a decrease in the volume of petitioner's business, and not to any intent or purpose to deprive these participants of benefits, does not compel us to hold otherwise.

Congress added paragraph (7) to section 401(a) in 1962 (Self-Employed Individuals Tax Retirement Act of 1962, Pub. L. 87–792, sec. 2, 76 Stat. 809) in order to prevent abuses resulting from terminations of forfeitable plans. The provision was prompted by congressional concern that absent such a requirement, an owner-employee with three or fewer employees would be able to establish a forfeitable retirement plan for his employees, make deductible contributions on which he would enjoy a tax-free buildup of income, then terminate the plan and have all amounts revert back to him. The enactment of section 401(a)(7) precluded the possibility that contributions might revert back to the owner-employee upon termination of a plan. H. Rept. 378, 87th Cong., 1st Sess. (1962), 1962–3 C.B. 261, 268–269, 275–276. However, Congress applied section 401(a)(7) to all retirement plans, including corporate plans, not merely to those that covered owner-employees. H. Rept. 378, *supra*, 1962–3 C.B. at 275; S. Rept. 992, 87th Cong., 1st Sess. (1962), 1962–3 C.B. 303, 328.[6] We infer from this a broader

---

[5]Petitioner, again citing respondent's revenue rulings, argues that the reductions in plan participation were not significant because not of the magnitude of those involved in the rulings. In our view, the reductions in plan participation of 34 percent and 51 percent, respectively, constituted significant percentage reductions in plan participation. We need not and do not decide whether a partial termination would occur where a significant *number* of participants, but not a significant *percentage*, are excluded from participation in a plan. See *Ehm v. Phillips Petroleum Co.*, 583 F.Supp. 1113 (D. Kan. 1984).

[6]Sec. 401(a)(7) codified the long-standing administrative practice of the Internal Revenue Service, which required that a qualified plan provide for fully vested rights in all participants upon termination of the plan. H. Rept. 378, 87th Cong., 1st Sess. (1962), 1962–3 C.B. 268–269; S. Rept. 992, 87th Cong., 1st Sess. (1962), 1962–3 C.B. 303, 328. See Rev. Rul. 61–157, 1961–2 C.B. 67, 87–88.

ameliorative purpose than simply one of preventing the reversion of contributions to an owner-employee. We think that Congress, in enacting section 401(a)(7), sought to protect employees from forfeiting their retirement benefits upon termination of a plan. See *United Steelworkers of America v. Harris & Sons Steel Co., supra* at 1298. This broader congressional purpose would be ill served by holding the presence or absence of an intent or purpose to deprive employees of benefits determinative of whether a termination had occurred. Where a significant percentage of plan participants are discharged, the effect is the same regardless of the employer's intent; unless the discharge is treated as a partial termination, a significant percentage of plan participants are compelled to forfeit accrued but unvested retirement benefits. See *Tionesta Sand & Gravel, Inc. v. Commissioner*, 73 T.C. 758, 762 (1980), affd. 642 F.2d 444 (3d Cir. 1981).[7]

Petitioner's argument boils down to the simple assertion that it was not at fault. Although this may be true, neither were the discharges the fault of the discharged employees, who nevertheless were compelled to forfeit their retirement benefits.[8]

We are not persuaded by petitioner's argument that our holding that the events that transpired here constituted partial terminations will make it impossible for civil engineering firms like petitioner, that are subject to fluctuations in work force, to maintain qualified retirement plans. Our holding merely requires that terminated employees be granted nonforfeitable rights to benefits. As respondent points out, this could have been accomplished at no additional cost to petitioner. The amounts accrued to the benefit of discharged employees were treated as forfeitures and were reallocated among the remaining plan participants. Had petitioner treated the discharges as partial terminations, those amounts would not have been forfeited and reallocated, but ultimately would have been

---

[7]We note that prior to amendment by ERISA, the antidiscrimination provisions of secs. 401(a)(3)(B) and 401(a)(4) provided a facts and circumstances test to determine whether a plan discriminated in favor of a prohibited group. The decisions of this Court on this issue focused not on the employer's intent, but rather on whether the plan operated so that the effect was to discriminate in favor of the prohibited group. See *E. F. Higgins & Co. v. Commissioner*, 74 T.C. 1029 (1980); *Loevsky v. Commissioner*, 55 T.C. 1144 (1971), affd. per curiam 471 F.2d 1178 (3d Cir. 1973), cert. denied 412 U.S. 919 (1973); *Ed & Jim Fleitz, Inc. v. Commissioner*, 50 T.C. 384 (1968).

[8]We need not and do not decide whether a discharge for cause might constitute a partial termination. Cf. Rev. Rul. 73-284, 1973-2 C.B. 139.

paid out as benefits to the discharged employees; the cost to petitioner and the plan would have been the same. Nor are we persuaded by the argument that our holding here will result in unfairness to employees who are not terminated. Petitioner argues that the short-term employee who is laid off in a work-force reduction will automatically be vested, whereas the long-term employee, notwithstanding his longer service and increased value to the employer, will not be fully vested before the time established in the plan's vesting schedule. Petitioner assumes that the short-term employee will be rehired by the employer, return to work with accrued benefits fully vested, and work alongside the long-term employee who may not be fully vested. The petitioner argues that the likelihood of such a scenario is considerable in a situation such as petitioner's, involving "temporary business fluctuations." Whatever the merits of this argument in a different factual context,[9] the reductions in work force here involved can hardly be described as "temporary." The figures for plan participation for the years 1973 through 1977 make clear that permanent reductions in force occurred in 1971 and 1972.

We hold that the discharge of 34 percent and 51 percent of plan participants in 1971 and 1972, respectively, constituted partial terminations of the plan. Accordingly, we hold that the plan is not a qualified plan under section 401(a).

*Decision will be entered for the respondent.*

---

[9]We need not and do not decide whether, under the facts and circumstances test of the regulations, a temporary work-force reduction might constitute a partial termination.